UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JESSICA GESSELE, ASHLEY GESSELE,
NICOLE GESSELE, TRICIA TETRAULT,
and CHRISTINA LUCHAU, on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

       v.

JACK IN THE BOX, INC., a corporation of
Delaware,

                    Defendant.

Case No. 3:10-cv-960-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

      Plaintiffs, Jessica Gessele, Ashley Gessele, Nicole Gessele, Tricia Tetrault, and

Christina Luchau, on behalf of all those similarly situated, have filed this putative class

action against defendant, Jack in the Box, Inc., for violation of the minimum wage and

overtime provisions of the Fair Labor Standards Act, 29 USC §§ 201 *et seq.* ("FLSA"), and

of various Oregon wage and hour laws.

      Plaintiffs have filed a Motion for Class Certification (docket #109). Plaintiffs seek

class certification of the Oregon classes under FRCP 23(b)(3). Plaintiffs also seek

1 - FINDINGS AND RECOMMENDATION

certification of their FLSA claims, either as FLSA classes under FRCP 23(b)(2) or as

FLSA collective classes under 29 USC § 216(b).  Jack in the Box objects to certification of

any class and particularly to any Oregon classes under FRCP 23(b)(3).  For the reasons that

follow, the Motion for Class Certification should be GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Parties

Jack in the Box is a Delaware corporation with its corporate headquarters in San

Diego, California.  Second Amended Complaint (docket #65), ¶ 6.  It has 557 stores in a

number of states, including Arizona, California, Colorado, Indiana, Kansas, Louisiana,

Missouri, North Carolina, Nevada, Ohio, Oklahoma, South Carolina, Tennessee, and Texas.

Stubblefield Decl. (docket #18), ¶¶ 2-3.  At the time this lawsuit was filed, Jack in the Box

was in the process of selling its Oregon stores to independent franchise operators.  Amended

Complaint (docket #34), ¶ 5.  It sold the last store involving any of the named plaintiffs in

active employment effective March 29, 2010, and with the exception of three Human

Resources temporary employees, it had no employees in Oregon at any level after

September 31, 2011.  Klusek Depo.,[1] p. 21; Defendant's Response (docket #116), p. 3.

The named plaintiffs are residents and citizens of Oregon who were employees of

Jack in the Box.  Second Amended Complaint, ¶ 5.  All employees started at minimum wage

positions.  Basham Depo., p. 42.  Entry level employment is at the "crew level;" the next

level up is as a "team leader," though both are hourly positions.  *Id.*  Team leaders are in

charge of running their shift, including making sure that all employees take their statutory

_____

[1]  Both parties have submitted documents with various attachments, including multiple excerpts of
depositions.  Unless otherwise indicated, all of the citations are directly to the authenticated depositions, not
to the documents to which they are attached.

2 - FINDINGS AND RECOMMENDATION

breaks.  J. Gessele Depo., pp. 48-49, 54.  Each shift has two team leaders, one of whom

comes in an hour later than the other.  *Id*, p. 56.  Also present is a store manager who is not

an hourly employee.  *Id*, pp. 55-56.

### A.    Christina Luchau

Christina Luchau ("Luchau") was employed by Jack in the Box from February 20,

2006, to March 28, 2010, when her store was sold to a franchise operator.  Parker Decl.

(docket #126), Ex. Z, p. 2.[2]  She continued working at Jack in the Box until July 7, 2011.

Luchau Depo., pp. 9-10.  She was an hourly employee except when working as an assistant

manager.  *Id*, pp. 13, 17.[3]  The remaining named plaintiffs were hourly employees at all

times during their employment with Jack in the Box.  Second Amended Complaint, ¶ 5.

During the course of her employment at Jack in the Box, Luchau purchased shoes

from Shoes for Crews approximately every five months because they would get holes and

fall apart.  *Id*, pp. 66-67.  Because she had previously worked at another fast food restaurant,

she had a pair of Shoes for Crews shoes when starting at jack in the Box and was permitted

to continue wearing those shoes until they wore out.  *Id*, p. 68.  When working in a

supervisory capacity, she told her employees that they had to go home if they were not

wearing Shoes for Crews shoes or slip guards.  *Id*, pp. 114-15, 118, 122.  At least one

_____

[2]  There is conflicting evidence regarding exactly when particular plaintiffs worked for Jack in the Box.  Jack in the Box has submitted a document listing each of the employees' hourly pay rates on various dates, which should coincide with their first and last dates of employment, but that document is not at all consistent with most of plaintiffs' testimony.  Parker Decl., Ex. Z.  For Luchau, the earliest date listed on this document is May 14, 2004, yet at her deposition she testified that she first began working for Jack in the Box on February 20, 2006.  Luchau Depo., pp. 11-12, 78.  Where this evidence conflicts, the court adopts the employee's version.

[3]  The evidence is inconclusive regarding the exact period when Luchau was a salaried assistant manager.  Luchau testified that she began as an assistant manager on September 18, 2006, and kept track of her pay stubs for "about the last six months, after [she] demoted from assistant manager."  Luchau Depo., pp. 13, 17.  However, it is not clear whether "the last six months" was six months prior to the transfer of her store to a franchise operator (March 2010) or was six months prior to stopping work (July 2011).  Jack in the Box's records shed no light on this issue.

3 - FINDINGS AND RECOMMENDATION

manager elected not to stock any slip guards to avoid the cost and instead sent employees home if they did not have Shoes for Crews shoes. *Id*, pp. 121-24.

When ordering shoes for other employees, Luchau wrote down their social security numbers and telephoned the order to Shoes For Crews. *Id*, pp. 116-17. She never filled out an order form. *Id*, p. 117. Employees were permitted to order Shoes for Crews for other people and to wear the shoes outside of work. *Id*, pp. 124-26. Employees who paid for the shoes directly rather than through a payroll deduction did not get the shoe discount which could be up to $5 per pair of shoes. *Id*, pp. 126-27.

Both as a team leader and assistant manager, Luchau was responsible for scheduling the breaks for all the employees in the store. *Id*, pp. 91-93. As an assistant manager, she could delegate this scheduling to a team leader. *Id*, p. 92. Occasionally Luchau would have to clock in early from her meal break if she was called back, someone needed help on the floor, or the store was just too busy and she was the only management employee on duty. *Id*, pp. 144-45. Luchau recalled a button on the time clock to push to see how many minutes of the break had elapsed, but she usually did not keep a close eye on the clock. *Id*, pp. 145-47. If needed, she would get "up out of the chair, clock back in, and [get] back to work." *Id*.

As an assistant manager, if Luchau found out that one of her crew members had taken less than a full 30 minute break, she either asked the employee or the team leader for the reason. *Id*, p. 145. Sometimes she edited the employee's time card to reflect a full 30 minute break even though he/she had taken less than 30 minutes. *Id*, pp. 93-94, 96. When she had to interrupt a crew member's meal break because the restaurant was too busy, she tried to get them an extra break later during the same shift. *Id*, p. 106. Luchau recalled that

at each of the several stores in Oregon where she worked, "quite a few times that employees wouldn't get their breaks," usually because the store was too busy.  *Id*, pp. 111-13.

### B.    Tricia Tetrault

Tricia Tetrault ("Tetrault") worked at Jack in the Box sporadically for brief periods from May 2004 to July 2008.  Parker Decl., Ex. Z, p. 2; Tetrault Depo., pp. 25-27, 29, 31, 33-34, 36, 38-39.[4]  Every time she was rehired, the manager told her that she had to order shoes from Shoes for Crews.  Tetrault Depo., pp. 60-61.  At some point, she asked if she could purchase shoes from Payless because they were cheaper, but was told that she "had to purchase them out of the magazine."  *Id*, pp. 60.  During the course of her employment, she purchased three pairs of shoes from Shoes for Crews, usually when the old pair was worn out.  *Id*, pp. 61-62.  She initially wore slip guards over her shoes, but her manager told her that she could not wear them regularly since employees were only permitted to wear them while waiting for delivery from Shoes for Crews.  *Id*, pp. 63-64.

Tetrault understood that she was entitled to a 30 minute unpaid meal break and would be paid if she was called back from the break early.  *Id*, pp. 25-29, 45.  She estimates that she was called back to work early during her lunch break "a whole lot" of times.  *Id*, pp. 47-48.  Usually she was called back to work because the restaurant was busy.  *Id*, p. 48.  When that occurred, management usually told her it would try to find time for her to make up the rest of her meal break, but that usually did not happen.  *Id*.  On a few occasions after Tetrault first started working at Jack in the Box, she forgot to properly punch the time clock which the manager fixed for her.  *Id*, pp. 46-47.

---

[4]  Tetrault testified that she first began working at Jack in the Box in May 2004 (Tetrault Depo., pp. 25, 35), but the first entry for her in Jack in the Box's records is January 1, 2005 (Parker Decl., Ex. Z, p. 2).

C.    **Ashley Gessele**

Ashley Gessele worked at Jack in the Box from August 8, 2006, until December 2008.  Parker Decl., Ex. Z, p.1; A. Gessele Depo, pp. 44, 68.[5]  Ashley had previously worked at another fast food restaurant where she was required to wear Shoes for Crews shoes.  A. Gessele Depo., p. 15.  When she began work at Jack in the Box in August 2006, she was told that she had to wear Shoes for Crews shoes, but could wear the ones she already had.  *Id*, pp. 15-17, 60-61.  When she needed new shoes, her supervisor ordered them for her.  *Id*, pp. 55-56.  Ashley filled out a payroll deduction form when ordering her shoes with the understanding that Jack in the Box would deduct the balance owed on the shoes from her paycheck.  *Id*, pp. 79-80.   Though the restaurant had several pairs of slip guards, she never wore them because they did not fit.  *Id*, p. 57.

Ashley was aware that she was required to take a 30 minute meal break and at least one 10 minute rest break, depending on the length of her shift.  *Id*, p. 37.  She took her breaks when her team leader or supervisor told her to take them.  *Id*, pp. 38-39.  Sometimes she would be called back sooner, but has no idea how many times that happened over the course of her employment.  *Id*, pp. 40, 42.   She does not recall if she was ever told that she could not take a meal break or if she ever forgot to punch out for a meal.  *Id*, pp. 44-45.  When taking her meal breaks, Ashley kept track of her time by looking at the clock and returning when she thought it had been 30 minutes, unless she was told to come back earlier.  *Id*, p. 48.  If she ever forgot to punch in or out or if she punched incorrectly, she

_____

[5]   Ashley testified that she stopped working for Jack in the Box in December 2008 (A. Gessele Depo., pp. 44, 68), but the last entry for her in Jack in the Box's records is January 1, 2009 (Parker Decl., Ex. Z, p. 1).

would tell her shift supervisor. *Id*, p. 78. If she did not realize that she had missed a punch, either a manager or someone in payroll would fix it. *Id*.

### D. **Jessica Gessele**

Jessica Gessele worked at Jack in the Box continuously from December 27, 2006, to November 23, 2009. Parker Decl., Ex. Z, pp. 2-3; J. Gessele Depo., pp. 12, 16, 24, 45-46, 48.[6] Jessica was hired as a team leader, but did not begin training for this position until March of 2007. *Id*, pp. 44-46. A few weeks after starting, Jessica was informed by her supervisor that she had to wear Shoes for Crews shoes and ordered a pair through a payroll deduction. *Id*, p. 22. Her supervisor permitted her to continue to wear her other shoes until her new ones arrived, but should not "make it known" that they were not from Shoes for Crews if there was an inspection. *Id*, p. 23. Jessica had previously worked at another fast food restaurant that also required its employees to wear Shoes for Crews shoes and had been permitted to buy them herself or order them by a payroll deduction. *Id*, p. 94. At Jack in the Box, she did not have the option of paying for the shoes herself. *Id*. Instead, her supervisor simply gave her the catalog and told her to let her know which shoes she wanted which the supervisor would order. *Id*, p. 95. Jessica never filled out an order form or saw anyone fill out an order form. *Id*. On the few occasions when she ordered shoes for other employees, Jessica asked for their social security number and the style and size of shoe which she called in. *Id*, pp. 96-97.

Though she cannot recall if she learned the rules about taking breaks during the orientation process, Jessica is aware that she was supposed to take 30 minute unpaid meal breaks. *Id*, p. 47. As a team leader for her shift, Jessica was responsible for making sure

---

[6] The first date that appears for Jessica in Jack in the Box's records is July 23, 2007, and the last date is November 22, 2009. Parker Decl., Ex. Z, pp. 2-3.

that employees took their meal and rest breaks.  *Id*, pp. 48-49.  Because it could be "hard when it gets busy if you don't know who needs a break," she filled out a form called a "placement chart" indicating when employees wanted to take their breaks.  *Id*.  Most employees on the day shift knew their schedules and just let Jessica know when they were going on their meal or rest breaks and pretty much rotated themselves.  *Id*, p. 54.

Jessica did not believe it was her responsibility as the team leader to make sure that employees took their 30 minute meal breaks, and she was unaware of any written rule as to who was supposed to watch when employees took their breaks.  *Id*.  As a team leader, Jessica never asked an employee to take less than a 30 minute meal break, though at times she came back early from her own meal break if the restaurant was busy or if employees were "struggling."  *Id*, pp. 80-81.  She was unaware if an employee ever recorded less than a full 30 minute meal break.  *Id*, p. 80.  If she forgot to punch in or out, she would tell the manager, but otherwise did not pay attention to whether the time clock accurately recorded her meal and rest breaks.  *Id*, pp. 81-82, 84-85.

### E.    Nicole Gessele

Nicole Gessele worked at Jack in the Box sporadically from 2003 to March 15, 2009.  Parker Decl., Ex. Z, p. 1; N. Gessele Depo., p. 45.[7]  At some point, she was promoted to team leader, but cannot remember whether that occurred in 2006, 2007, or 2008.  N. Gessele Depo., p. 35.

When hired in 2006, Nicole recalls being told by management that she had to wear Shoes for Crews shoes.  *Id*, pp. 63-64.  When she needed to order new shoes, she would just tell someone in management who ordered them for her.  *Id*, pp. 64-65.  She did not recall

---

[7]  Nicole testified that she first began working at Jack in the Box in 2003 (N. Gessele Depo., p. 45), but the first entry for Nicole in Jack in the Box's records is September 13, 2004 (Parker Decl., Ex. Z, p. 1).

ever ordering shoes for any other employees in her role as a team leader. *Id.* Nicole was aware that Jack in the Box would deduct the cost of the shoes from her paycheck. *Id*, pp. 71-72. She could not recall if she ever filled out the order form or just called the order in over the telephone. *Id*, p. 71.

As a team leader, Nicole understood that she was responsible for making sure that her employees clocked in and out for their meal and rest breaks. *Id*, pp. 43-44. In order to keep track of when employees were supposed to go on break, Nicole kept a written schedule indicating whether they needed one 10 minute break and one 30 minute lunch (if working a six hour shift) or if they needed two 10 minute breaks and one 30 minute lunch (if working an eight hour shift). *Id*, p. 43. Nicole did not monitor whether employees were taking full 30 minute lunch breaks, as she understood that this was the employee's responsibility. *Id*, p. 54. Nicole recalled a "couple" of times when she did not get her full 30 minute meal break either because she saw that her employees were swamped so she clocked back in, she was asked to come back early by a manager or other team leader, or it was just too busy for her to take her break. *Id*, pp. 55-58.

## II.    <u>Wage and Hour Allegations</u>

Plaintiffs, on behalf of themselves and others similarly situated, allege that Jack in the Box violated various state and federal wage and hour laws based on three categories of violations: (1) wrongful deductions for the Workers' Benefit Fund assessment; (2) wrongful deductions for shoes; and (3) failing to pay for break periods.

///

///

///

9 - FINDINGS AND RECOMMENDATION

A.    **Workers' Benefit Fund Assessment**

The Workers' Benefit Fund ("WBF") is an Oregon program that provides various benefits to workers injured on the job and is funded by an assessment paid by every employer and employee to the State of Oregon based on the number of hours worked by that employee. Second Amended Complaint, ¶ 12. The WBF assessment rate is supposed to be divided evenly between the employer and the employee. *Id*; Egan Decl. (docket #111), Ex. 6. All nonexempt hourly employees, including team leaders, are subject to the same WBF rate. DeChant Depo., pp. 32-33; Klusek Depo., pp. 26-27. For example, if the WBF assessment rate is 3.6 cents per hour (as in 2003), then the employer is required to withhold 1.8 cents from each individual employee's paycheck for every hour worked. Second Amended Complaint, ¶ 12. At the end of the quarter, the employer is required to pay 3.6 cents for every hour worked by its employees, which should reflect the 1.8 cents withheld from the employee and the employer's contribution of 1.8 cents. *Id*.

Every fall, Oregon publishes the new WBF assessment rate and mails it with a written notice to all employers registered with the Secretary of State. *Id*; Egan Decl., Ex. 6. The rate is also published in print and on the internet. *Id*. Jack in the Box's payroll manager receives electronic updates from the state. Sanderlin Depo., pp. 16, 37-38. Jack in the Box has been continuously registered with the Oregon Secretary of State for over 25 years. Second Amended Complaint, ¶ 12.

Plaintiffs allege that for every year since 2003, the WBF assessment rate was less than 3.6 cents per hour, yet Jack in the Box continued to withhold 1.8 cents per hour from its employees' wages while paying the appropriate WBF rate to the State of Oregon. *Id*, ¶ 13. Consequently, Jack in the Box paid less than its half of the WBF assessment because

it withheld too much from employee wages for every year since 2003.  *Id*.  For example, in 2006, when the WBF assessment rate was 3.0 cents per hour, the employee and the employer were supposed to each contribute 1.5 cents per hour worked.  *Id*.  However, employees contributed 1.8 cents per hour, while Jack in the Box paid only 1.2 cents.  *Id*. Plaintiffs allege that this deduction reduced their pay below the minimum wage and resulted in being paid less than time-and-a-half for their overtime hours.  *Id*, ¶ 14.  Plaintiffs further allege that these deductions were improperly applied to all employees, whether hourly or salaried, and the improper deduction invalidated any exemption that might apply to salaried employees.  *Id*.

During the course of depositions in this case, Jack in the Box's current Payroll Manager, Barbara Klusek, discovered that when Jack in the Box's computer system was updated to reflect decreases in the overall assessment rate, another program was not updated to change the individual employee's share of the deduction.  Klusek Depo., pp. 19-22, 69. This problem was corrected on February 10, 2012.  *Id*, p. 69.

### B.    Shoe Deductions

Employees are required to wear a uniform which consists of a hat, shirt, apron, name tag, pants, and shoes.  Basham Depo., p. 65-66.  Employees can wear any jeans; Jack in the Box provides the hat, shirt, apron, and name tag; and employees have to provide their own shoes.  *Id*, pp. 66, 79.

Plaintiffs allege that Jack in the Box requires its employees to wear slip-resistant shoes as part of their required work attire, specifying the minimum coefficient of friction level.  Second Amended Complaint, ¶ 8; James Depo., p. 21, 23-24; Egan Decl., Exs. 16-23. This is a nationwide policy.  James Depo., pp. 65-66.  To meet the slip-resistant shoe

requirement, Jack in the Box provides a list of approved manufacturers, and employees are not permitted to wear other shoes even if they otherwise meet Jack in the Box's coefficient of friction requirements. Second Amended Complaint, ¶ 8. Shoes for Crews has always been an approved vendor, but Jack in the Box has recently added several other vendors, including Footstar, Keuka, and Sketchers. James Depo., pp. 35-36.

Employees can purchase nonslip shoes from various approved vendors and can elect to pay for those shoes by means of a payroll deduction. Second Amended Complaint, ¶ 9; Klusek Depo., p. 23. When Jack in the Box first enacted the slip-resistant shoe requirement, employees could wear any kind of brand, but sometime after 2000 were required to purchase shoes from Shoes for Crews. Basham Depo., p. 56, 58. Though each store has slip guards that employees can wear over their shoes, managers are supposed to tell employees to not wear the slip guards forever, but to purchase shoes from an approved vendor. *Id*, pp. 60-61.

Jack in the Box pays the manufacturer for the shoes and deducts the price of the shoes from the employee's wages over four paychecks. Second Amended Complaint, ¶ 9; Klusek Depo., p. 23; James Depo., p. 53. Prior to February 2012, if an employee was terminated with an unpaid balance, then the entire balance was deducted from the final paycheck. Sanderlin Depo., pp. 118-19, 126-27. As of February 2012, if an employee is terminated with an unpaid balance, then Jack in the Box deducts only one of the remaining payments, rather than the entire balance, from the final paycheck. *Id*, pp. 126-27.

Jack in the Box has submitted evidence from several Oregon store managers and assistant managers attesting that employees are permitted to either wear shoes they already own, as long as they meet the Jack in the Box standards, or slip guards over their regular shoes. Leach Decl. (docket #117), ¶¶ 9-10; Rios Decl. (docket #119), ¶ 4; O'Rourke Decl.

(docket #120), ¶ 6; Evenson Decl. (docket #121), ¶ 5; Barker Decl. (docket #122), ¶ 11;

Horning Decl. (docket #123), ¶ 4; Jones Decl. (docket #124), ¶¶ 10-11.  The individual

stores typically have a supply of slip guards available.  *Id.*  Most employees wear the slip

guards when they forget their work shoes or are waiting for their shoes to arrive.  Rios

Decl., ¶ 4; O'Rourke Decl., ¶ 6; Evenson Decl., ¶ 5; Horning Decl., ¶ 5.  Slip guards are

purchased by Jack in the Box's distribution centers to which restaurants place orders as

needed.  James Depo., pp. 36-37.  At least one manager testified that employees purchasing

shoes from Shoes for Crews have a choice of ordering them through a payroll deduction or

paying for them on their own.  Leach Decl., ¶ 11.

An employee electing to purchase shoes by a payroll deduction may sometimes, but

not always, fill out a payroll deduction authorization form.  Leach Decl., ¶¶ 11-12;

O'Rourke Decl., ¶¶ 7-8; Evenson Decl., ¶ 6; Barker Decl., ¶ 12; Jones Decl., ¶ 12.  The

authorization form for Shoes for Crews states as follows:

> Shoes for Crews ® Voluntary Shoe Purchase Agreement
>
> I do hereby authorize the Company to deduct the balance owed on my
> shoe purchase following the Payroll Department's receipt of the Shoes
> for Crews invoice.  If I terminate my position prior to the Shoes for
> Crews purchase being paid in full, I authorize the Company to deduct
> the unpaid balance from my final paycheck.
>
> I understand it is my responsibility to return shoes to the Shoes for
> Crews warehouse if a shoe size change or refund is desired.  THIS IS
> A VOLUNTARY PROGRAM AND IS NOT A CONDITION OF
> EMPLOYMENT WITH THE COMPANY.

Egan Decl., Ex. M., p. 20.

These forms are supposed to be kept by the store managers, but were among the

documents not transferred to the franchisees in 2010.  Tennant Depo., p. 233.

13 - FINDINGS AND RECOMMENDATION

According to plaintiffs, Jack in the Box selects only those shoe manufacturers that agree to indemnify it a certain amount on medical expense claims resulting from a slip and fall while an employee is wearing that manufacturer's shoes purchased through a payroll deduction. Second Amended Complaint, ¶ 8; Basham Depo., p. 65; James Depo., p. 40; Egan Decl., Ex. 25, pp. 3, 5-6. In order to receive an indemnity payment, the injury cannot occur in a cooler, cannot involve a trip hazard, and must involve shoes less than six months old. James Depo., pp. 40-41. The manufacturer pays Jack in the Box $2.00 for every pair of shoes that an employee purchases through payroll deduction. Second Amended Complaint, ¶ 8; James Depo. pp. 43, 46-47; Egan Decl., Ex. 25, pp. 2-3, 7.

Each quarter Jack in the Box receives a check from the shoe manufacturer for the $2.00 per pair of shoes ordered by employees through a payroll deduction. *Id*, ¶ 10; James Depo., p. 45; Sanderlin Depo., pp. 115-18. Because this "kickback" or "rebate" is not passed on to the employees, employees pay $2.00 more per pair of shoes than Jack in the Box does. Second Amended Complaint, ¶ 10; Sanderlin Depo., pp. 44, 122; Tellez Depo., p. 17. Since 2003, Jack in the Box has received more than $1 million shoe "rebates" or "kickbacks" from Shoes for Crews. Second Amended Complaint, ¶ 10; James Depo., p. 43; Egan Decl., Ex. 35, p. 7. This amounts to approximately 500,000 pairs of shoes sold since 2003. James Depo., p. 43. Since 2004 Jack in the Box has written off $1.76 million for shoes that it purchased but was unable to recoup through the payroll deduction program. *Id*, p. 44; Sanderlin Depo., pp. 117-18. Since 2007 Jack in the Box has received $295,000 in indemnity payments. James Depo., p. 44.

Plaintiffs allege that because the shoes are part of a required uniform, Jack in the Box receives a benefit while the employees receive less than the minimum wage and less

than time-and-a-half for overtime pay.  Second Amended Complaint, ¶ 11.  Plaintiffs further allege that the shoe deductions are improperly applied to all employees, whether hourly or salaried, and the improper deduction invalidates any exemption that might apply to salaried employees.  *Id.*

### C.    **Payment for Break Periods**

Jack in the Box's meal and rest break policies generally require employees working shifts of six hours or more to take a 30 minute unpaid meal break.  *Id*, ¶ 16; Burtchett Depo., pp. 46-47; Egan Decl., Exs. 31-33; Defendant's Ex. AA.[8]  Shorter breaks of less than 30 minutes are considered "rest periods" and are paid as part of the hours worked.  *Id*; Second Amended Complaint, ¶ 15.  If the meal break is "interrupted by calls to duty, then [the] entire meal break must be counted as hours worked."  Egan Decl., Ex. 31, p. 3; Egan Decl., Ex. 33.  This is consistent with the following On Duty Meal Policy signed by Luchau:

> I hereby agree with my employer that on those sporadic occasions when the nature of my work prevents me from being relieved of all duties during my required meal period, I shall be paid for those meal periods.  I may revoke this agreement in writing at any time.

Egan Decl., Ex. 30.

Plaintiffs allege that Jack in the Box trains its managers that the needs of the restaurant come first and to bring employees back from breaks early to help out during a rush period.  Second Amended Complaint, ¶ 16.  They also allege that Jack in the Box drew the line between paid and unpaid breaks at 20 minutes, rather than 30 minutes as stated in its policy and as required by state and federal laws, and programmed its computers not to pay employees for any break longer than 20 minutes.  *Id.*

---

[8] Jack in the Box cites to its meal and break policy as being attached to Exhibit EE, but the record contains no exhibit EE.  Instead, this policy appears to be attached as Exhibit AA.

Jack in the Box has used two timekeeping systems during the relevant time period.[9] *Id*, ¶ 17. Both systems were consistently used by all Jack in the Box restaurants nationwide. Burtchett Depo., p. 10; Evans Depo, p. 21; Rohlfs Depo., p. 14. All the calculations for both systems are performed at the centralized timekeeping system located in San Diego, California. Burtchett Depo. p. 40.

The first system, Kronos, tracked only the time of each employee's "punch," but did not record whether the punch reflected that the employee was clocking in, clocking out, or taking a meal or rest period. Second Amended Complaint, ¶ 17. Under this system, plaintiffs allege that if the time between two punches was 21 or more minutes long, then none of the break was paid. *Id*. In other words, the Kronos system did not compensate employees for meal or rest periods that were longer than 20 minutes but less than 30 minutes. *Id*, ¶ 20.

At some point, Jack in the Box adopted a new timekeeping system, Jack's Timekeeping, which requires employees to designate whether they are clocking out for a rest period, meal period, or at the end of their shift. Second Amended Complaint, ¶ 18. When an employee clocks back in from a rest period, the Jack's Timekeeping system compensates the employee only for the first 20 minutes of the rest period, regardless of the actual length of the rest period. *Id*. The system does not permit an employee to punch back in from a rest break any earlier than 10 minutes without a manager override. Evans Depo., p. 14. For example, if someone clocks out for a rest break and comes back 40 minutes later, the Jacks Timekeeping system will classify the time as 20 minutes of paid rest break time

---

[9] Plaintiffs have not clearly defined the relevant time period when each timekeeping system was used.

and 20 minutes of unpaid time.  *Id*.  Breaks that last "20 minutes and one second" are

unpaid, while breaks that are "20 minutes on the dot" are paid.  *Id*; Rohlfs Depo., p. 14.

Under the Jack's Timekeeping system, meal breaks of any duration are unpaid and

recorded slightly differently.  Evans Depo., pp. 16-17.  Because employees must indicate

what kind of break they are taking when clocking out, none of the time for a meal period is

paid even if only three minutes long.  *Id*.  However, Jack's Timekeeping prevents

employees from clocking in from a meal period prior to 30 minutes without a manager's

override.  Second Amended Complaint, ¶ 18; Evans Depo., p. 14.  Additionally, managers

may edit time sheets.  Evans Depo., pp. 16-17.  For example, if an employee clocks out for a

meal break expecting to take the whole 30 minutes, but is required to return to work after

only three minutes, the manager must override the system to allow the employee to clock

back in and can also edit that employee's time sheet to reflect that the break was a "rest

period" as opposed to a "meal break."  *Id*.

Jack's Timekeeping allows employees who are working the graveyard shift to be

paid for a meal break up to 30 minutes.  *Id*, p. 22; Egan Decl., Ex. 32.  If the meal break

lasts 35 minutes, then the employee is paid for 30 minutes and not paid for five minutes.  *Id*.

To summarize, under both systems, if a break is over 20 minutes long, then it is

generally considered a "meal break" and is unpaid; but if the break is 20 minutes or less,

then it is considered a "rest break" and is paid.  DeChant Depo., pp. 102-103, 110; Basham

Depo., pp. 82-83; Rohlfs Depo., pp. 19-20.  If an employee is sent on a 30 minute meal

break, but is called back to work after 15 minutes, then he or she is paid for the 15 minutes

on break.  Rohlfs Depo., pp. 40-41.  However, if an employee is called back after 22

minutes, he or she is not paid for any of the break.  *Id*.

17 - FINDINGS AND RECOMMENDATION

Managers have a couple of "configuration" choices that they may make to the timekeeping system in use at their stores, but may not change the system's default time cutoff for tracking paid breaks.  Pettijohn Depo., pp. 16-17.  Managers are authorized to ask employees to come back early from a meal period if, for example, the restaurant is busy.  Tennant Depo., pp. 188-89.  It is also the manager's daily responsibility to check that employees get their full 30 minute meal break.  Rohlfs Depo., p. 41.

Jack in the Box has submitted evidence from several Oregon store managers and assistant managers generally attesting that when hired as management trainees, they received training in Oregon law concerning breaks and that each restaurant displays at least one poster explaining Oregon law.  Leach Decl., ¶ 2; Rios Decl., ¶ 2; O'Rourke Decl., ¶ 2; Evenson Decl., ¶ 2; Barker Decl., ¶ 4; Horning Decl., ¶ 2; Jones Decl., ¶¶ 2-3.  Management employees are responsible for making sure that hourly employees take their rest and meal breaks, which generally means that an employee who works more than six hours has one 10 minute paid rest break and one 30 minute unpaid meal break; an employee who works more than eight hours is entitled to an additional paid 10 minute rest break.  Leach Decl., ¶¶ 3-4; Evenson Decl., ¶¶ 2-3; Barker Decl., ¶ 2; Horning Decl., ¶¶ 2-3; Jones Decl., ¶ 2.

Many managers have a practice of listing the employees working a shift, the hours they work, and approximately what times they are expected to take their breaks.  O'Rourke Decl., ¶ 3; Barker Decl., ¶ 5; Jones Decl., ¶ 4.  Under this system, the manager indicates that the employee has taken a break, later turning over the sheet to the District Manager with the other timekeeping documents.  *Id*.  At some point, this stopped being a required practice. *Id*.

18 - FINDINGS AND RECOMMENDATION

Employees are required to clock out for their breaks, though at least two managers enforce this only for the unpaid 30 minute meal break.  Leach Decl., ¶ 4; Rios Decl., ¶¶ 2-3; O'Rourke Decl., ¶ 4; Evenson Decl., ¶ 2; Barker Decl., ¶ 5; Horning Decl., ¶¶ 2-3; Jones Decl., ¶ 5.  During a meal break, an employee is permitted to leave the restaurant unless working the graveyard shift.  Leach Decl., ¶ 5; Rios Decl., ¶ 3; O'Rourke Decl., ¶ 5; Evenson Decl., ¶ 4; Barker Decl., ¶¶ 2, 9; Horning Decl., ¶ 3; Jones Decl., ¶¶ 6-7.  Graveyard shift employees are paid for meal breaks since they are not permitted to leave the restaurant once the dining room is closed for safety reasons.  *Id.*

None of the managers ever ask employees to perform any work off the clock.  Leach Decl., ¶ 7; Rios Decl., ¶ 3; O'Rourke Decl., ¶ 5; Evenson Decl., ¶ 4; Barker Decl., ¶ 9; Horning Decl., ¶ 3; Jones Decl., ¶ 6.  In the rare circumstance when a manager asks an employee to come back early from a meal break, the manager makes sure that the employee clocks back in in order to be paid for that part of the break that was taken.  Rios Decl., ¶ 3; Horning Decl., ¶ 3; Jones Decl., ¶ 6.  If possible, the manager will make sure that the employee makes up the leftover break time later that day.  *Id.*  Some managers send employees out for another full 30 minute break later in the shift when they are called back during an earlier meal break.  O'Rourke Decl., ¶ 5; Barker Decl., ¶ 9.

When hiring new employees, managers review all the company policies with the employees, including the meal and rest break policies.  Leach Decl., ¶¶ 3, 7; Barker Decl., ¶¶ 3, 10; Jones Decl., ¶ 4.  When not present in the restaurant, management employees often rely on team leaders to send hourly employees on their breaks, but often check the hours report to make sure that breaks were indeed given.  Leach Decl., ¶ 3; Evenson Decl., ¶ 3; Barker Decl., ¶ 3; Jones Decl., ¶ 9.

An employee who messes up a punch or forgets to clock in or out typically leaves a note telling the manager what happened in order for the manager to adjust the time records appropriately.  Leach Decl., ¶ 8.  In such circumstances, some managers print out the adjusted time record, have the employee sign it, and keep it in the employee's file.  Barker Decl., ¶ 8.  Managers might also check the restaurant's "Exception Report" or "Exception Log" to see if employees have missed a break or forgotten to clock in properly.  Evenson Decl., ¶ 3; Jones Decl., ¶ 8.  When changing a time record, the manager typically writes the reason for the exception, signs it, has the employee sign it, and sometimes mails the log in with other weekly paperwork.  Jones Decl., ¶ 8.

Plaintiffs allege that they are entitled to be paid for all meal periods of less than 30 minutes, and that the nonpayment results in receiving less than the minimum wage and less than time-and-a-half for their overtime hours.  Second Amended Complaint, ¶¶ 20-22.  According to plaintiffs, the improper deductions invalidate any exemption that might apply to salaried employees for each week in which the deduction was made.  *Id*, ¶ 22.  Moreover, plaintiffs allege that those employees, such as Luchau, in stores that were transferred to a franchisee did not receive their earned and unpaid wages within the period required by law following the ownership transfer.  *Id*, ¶ 23.

## FINDINGS

For some time, the parties have disagreed about the way that this case should proceed.  Plaintiffs wish to avoid the cost of sending opt-in notices to FLSA collective class members if they have no viable legal claims, while Jack in the Box seeks to avoid the disadvantage of one-way intervention.  The parties' approaches to certification reflect these differences.

20 - FINDINGS AND RECOMMENDATION

Plaintiffs' motion is styled as a "dual certification" motion because they seek to certify both the Oregon and the FLSA claims at the same time.  These are two distinctive and mutually exclusive types of class actions.  The FLSA only permits "collective actions" involving plaintiffs who "consent" by affirmatively opting into the case.  A member of the class who opts in is bound by the class action adjudication and barred from filing an individual claim within the limitations period.  In contrast, a member of a class certified under Rule 23 is a party to the action unless he affirmatively opts out.

Plaintiffs provide two options for dual certification:  (1) a "hybrid certification" approach which certifies both the Oregon and the nationwide FLSA claims under Rule 23; or (2) the "traditional" dual certification approach which conditionally certifies the nationwide FLSA collectives under § 216(b) and the Oregon classes under Rule 23. Plaintiffs prefer the hybrid certification approach which would certify the FLSA claims as nationwide Rule 23(b)(2) classes for declaratory judgment on liability only.  This approach saves the expense of sending nationwide opt-in notices under § 216(b) until after liability is established through Rule 23(b)(2).  Once liability is resolved, assuming any claims survive, plaintiffs would then seek to certify the opt-in FLSA collective class for damages pursuant to § 216(b).  According to plaintiffs, this approach strikes the most appropriate balance between the parties' competing concerns since a Rule 23(b)(2) class does not include a request for damages, does not require notice to the class members, and, by applying to all class members, avoids the one-way intervention issue.  In the alternative, plaintiffs seek conditional certification of the nationwide FLSA collective class under § 216(b), which would require them to send the nationwide "opt-in" notice to all the putative collective members.

Jack in the Box contends that dual certification of any kind is inappropriate and that the proper approach is to consider only conditional certification of the opt-in FLSA collectives under § 216(b) and decline consideration of certification of the Rule 23 Oregon classes until after the FLSA opt-in period has elapsed.  After the FLSA collective members have had a chance to opt in, then plaintiffs may renew their motion for Rule 23 certification of the Oregon classes.

Given this fundamental disagreement, the court must first determine whether it is prudent to proceed with dual certification, and if so, under what approach.

I.    **Compatibility of FLSA and Oregon Claims**

    A.    **Hybrid Certification**

Due to the differences between class actions under Rule 23 and collective actions under the FLSA, this court concludes that plaintiffs cannot certify a class action under Rule 23 to determine liability under the FLSA.

Plaintiffs cite several cases supporting the hybrid certification of declaratory actions under the FLSA as Rule 23(b)(2) class actions.  These cases date from the 1970s, are from district courts outside the Ninth Circuit, are neither binding nor persuasive, and represent a view which the Ninth Circuit has rejected.

One unreported case cited by plaintiffs did not decide the issue, but merely stated that "on agreement of the parties," the equal pay provision of the FLSA was designated a class action under Rule 23(b)(2).  *Board of Regents of the Univ. of Neb. v. Dawes*, No. Civ. 73L-190, 1975 WL 125, at *1 (D Neb Jan. 2 1975), *rev'd*, 522 F2d 380 (1975).  Another case cited by plaintiffs, *King v. Carey*, 405 F Supp 41, 44 (WD NY 1973), cited and relied on another case, *Souder v. Brennan*, 367 F Supp 808 (DC 1973), as authority to certify a

Rule 23(b)(2) class action for FLSA claims.  However, the same judge who decided *Souder* also decided the earlier case of *Laffey v. Northwest Airlines, Inc.*, 321 F Supp 1041, 1042-43 (DC 1971), which certified FLSA classes under both Rule 23(b)(2) and (3).  The Ninth Circuit has specifically rejected the "minority view of *Laffey*" in favor of the "clear weight of authority hold[ing] that Rule 23 procedures are inappropriate for the prosecution of class actions under § 216."  *Kinney Shoe Corp. v. Vorhes*, 564 F2d 859, 862 n3 (9th Cir 1977), *overruled on other grounds by Hoffman-La Roche Inc. v. Sperling*, 493 US 165, 167 n1 (1989) (citations omitted).  In so concluding, it adopted the reasoning of two other circuits holding "that Rule 23 and § 216 class actions are 'mutually exclusive' and 'irreconcilable."  *Id* at 862, citing *Schmidt v. Fuller Brush Co.*, 527 F2d 532, 536 (8th Cir 1975) and *LaChapelle v. Owens-Illinois, Inc.*, 513 F2d 286, 289 (5th Cir 1975).

Thus, in the Ninth Circuit, FLSA claims cannot be certified as Rule 23(b)(2) class actions for injunctive or declaratory relief.[10]  Based on the same reasoning, plaintiffs also cannot certify FLSA claims for damages under Rule 23(b)(3).  As a result, any Rule 23 class action in this case must be limited to plaintiffs' state law claims.

### B.   Dual Certification

That leads to the next issue of whether the court should certify the FLSA collectives at the same time, before, or after the Rule 23(b)(3) classes.  The court retains the discretion to decide on the best approach.

Jack in the Box urges this court to follow what it calls the "Oregon approach" and conditionally certify the FLSA collectives and postpone certification of Rule 23(b)(3) state law classes until the FLSA opt-in period ends.  This approach has two advantages.  First, the

---

[10]  As a result, this court need not address the alternative argument by Jack in the Box that the named plaintiffs, none of whom are current employees, are not proper parties to seek injunctive or declaratory relief.

second tier of the FLSA certification inquiry overlaps with, and can be considered at the same time as, the Rule 23 inquiry. Second, after receiving more information about those who opt in to the FLSA action, the court is in a better position to decide whether supplemental jurisdiction over the state law claims is appropriate.

### 1.    "Oregon Approach"

In support of the "Oregon approach," Jack in the Box cites several cases from this district which declined to certify a Rule 23 class until after the FLSA collective members had a chance to opt in. *See Norman v. Dell Inc.*, No. Civ. 07-6028-TC, 2008 WL 2899722, at *3 (D Or July 10, 2008); *Gonzalez v. Select Onion Co.*, No. Civ. 06-1056-SU, 2007 WL 1989698, at *3 (D Or July 6, 2007); *Thiebes v. Wal-Mart Store*s, No. Civ. 98-802-KI, 1999 WL 1081357, at *4 (D Or Dec. 1, 1999). Jack in the Box primarily relies on *Thiebes* in which Judge King declined to certify a Rule 23 class at the same time he conditionally certified the FLSA collective for several reasons, including case management concerns about fashioning an effective notice, issues concerning numerosity, the defendant's expressed intent to move against the state law claims, and the lack of evidence establishing that a class action was the superior method for resolving the claims. 1999 WL 1081357, at *4. However, many of the reasons that informed Judge King's decision to delay Rule 23 class certification are not present here.

First, with regard to the difficulty of fashioning an effective notice, plaintiffs have not yet filed a motion for notice. Thus, any challenges to the adequacy of the notice are premature and, without more, are not enough to decline to consider the merits of certification of the Rule 23 classes at the same time the FLSA collectives. Moreover, plaintiffs have submitted an declaration from Cameron Azari (docket #129), a nationally

recognized notice expert, who attests that fashioning an effective joint notice is not unworkable or unduly confusing. Azari also provides a detailed analysis of how he would approach fashioning an effective notice in this case.  Furthermore, other courts have concluded that the potentially difficult challenge of fashioning an effective notice, while a "valid case-management consideration," does not serve as a barrier to dual certification. *Ervin v. OS Rest. Services, Inc.*, 632 F3d 971, 978 (7th Cir 2011); *see also Bouaphakeo v. Tyson Foods, Inc.*, 564 F Supp2d 870, 887-89 (ND Iowa 2008); *Ellison v. Autozone, Inc.*, No. Civ. 06-7522-MJ, 2007 WL 2701923, at *2-3 (ND Cal Sept. 13, 2007); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. Civ. 00-C-5755, 2004 WL 1459486, at *1-2 (ND Ill June 28, 2004).

Additionally, Judge King's conclusion that the Rule 23 numerosity analysis would be informed by how many class members opt in to the FLSA collective is not relevant here.  In *Thiebes*, both the FLSA collective and the Oregon class consisted only of Oregon employees with overtime claims.  In contrast here, plaintiffs assert that the FLSA collectives potentially span hundreds of thousands of employees across 21 states, while the Oregon classes are limited to approximately 5,000 Oregon employees.  Moreover, the Oregon classes include claims for minimum wage, overtime, unpaid wages upon termination, wrongful deductions, and unpaid wages, while the FLSA collectives include claims only for minimum wage and overtime.  Absent the numerosity concerns present in *Thiebes*, waiting to see how many people opt in to the FLSA collective will not necessarily be helpful in gauging the potential interest of the Oregon class members or whether they satisfy Rule 23's numerosity requirements.

25 - FINDINGS AND RECOMMENDATION

It also bears mentioning that this case also differs from Judge Sullivan's recommendation in *Gonzalez*, 2007 WL 1989698, at *3, to deny certification of the Oregon classes which was based in part on the need for further discovery to the number of potential class members.  Here the parties have conducted extensive discovery, including taking depositions of numerous parties, exchanging requests for admission, and exchanging documents.  Consequently, discovery has been adequate for purposes of providing enough evidence from which the court can evaluate the merits of the certification motions.

Despite ample authority for the proposal advanced by Jack in the Box, no "Oregon approach" requires this court to only consider conditional certification and delay class certification.  Keeping in mind that district courts retain broad discretion when it comes to class certification, the reasons present in the cases cited by Jack in the Box are of limited value to the issues presented in this case.

### 2. Supplemental Jurisdiction

Jack in the Box argues that waiting to certify the Rule 23 state law classes is appropriate because supplemental jurisdiction issues often emerge after conditional certification of FLSA collectives.  In support, it relies primarily on *Ballaris v. Wacker Siltronic Corp.*, No. Civ. 00-1627-KI, 2002 WL 926272, at *2-3 (D Or Feb. 7, 2002), where Judge King considered, in connection with a motion to dismiss, whether to exercise supplemental jurisdiction over a Rule 23 class after certifying the opt-in FLSA collective.  Plaintiffs dismiss Jack in the Box's concern about supplemental jurisdiction since this court has original jurisdiction over the state claims by way of the Class Action Fairness Act of 2005 ("CAFA"), 28 USC § 1332(d)(2) & (5).

CAFA gives district courts original jurisdiction over civil class actions where:  there are more than 100 class members, the amount in controversy exceeds $5,000,000, any member of the class is a citizen of a different state from any defendant, and the primary defendants are not government entities.  28 USC § 1332(d)(2) & (5); *Baas v. Dollar Tree Stores, Inc.*, No. Civ. 07-3108-JSW, 2007 WL 2462150, at *3 (ND Cal Aug. 29, 2007).  However, contrary to plaintiffs' assertion, it is not at all clear that the CAFA requirements are met here.[11]  The Second Amended Complaint satisfies some of the CAFA requirements.  Second Amended Complaint, ¶¶ 5-6 (diversity of citizenship and defendant not a government entity), ¶ 26 (more than 100 members).  However, it does not explicitly allege that the Oregon claims are predicated on original jurisdiction under CAFA and is silent about the exact amount in controversy.  If this court indeed has independent CAFA jurisdiction over the state law claims, then any arguments regarding supplemental jurisdiction would be rendered moot.  *See Bouaphakeo*, 564 F Supp2d at 888-89 (concluding that the procedural differences between Rule 23 class actions and FLSA collective actions are less relevant where the state claims have an "independent jurisdictional basis" by way of CAFA).  However, based on the allegations in the Second Amended Complaint, the court must assume that is has jurisdiction over the state law claims and potential classes only by way of supplemental jurisdiction.

The FLSA claims confer jurisdiction in this court under 28 USC § 1331.  If the court certifies a Rule 23 class at the same time as the FLSA collective and only a limited number

---

[11]  In their Reply, plaintiffs seek leave to amend the Second Amended Complaint to add the appropriate allegations to satisfy CAFA.  If plaintiffs wish to amend, they must file a formal motion and allow Jack in the Box an opportunity to respond.

of plaintiffs opt into the FLSA collective, then the court might be presented with a

"jurisdictional conundrum" with regard to jurisdiction over the state law claims. *Aguirre v.*

*Albertson's Inc.*, 201 Or App 31, 44, 117 P3d 1012, 1020 (2005).  Specifically, the court

"might be faced with the somewhat peculiar situation of a large number of plaintiffs in the

state law class who have chosen not to prosecute their federal claims" and, thus, must

consider "the propriety of the court's exercise of supplemental jurisdiction over the state

law claims – *i.e.*, that the state law claims would substantially predominate over the federal

claims." *Edwards v. City of Long Beach*, 467 F Supp2d 986, 992 (CD Cal 2006) (citation

and quotation omitted).  Because of this possibility, Jack in the Box urges the court to

exercise its discretion and decline to reach the merits of the Rule 23 certification at this

stage.

It is well-established that it is "within the district court's discretion to exercise

supplemental jurisdiction" over state law claims in an FLSA case.  *Wang v. Chinese Daily*

*News, Inc.*, 623 F3d 743, 461 (9th Cir), *judgment vacated on other grounds*, 132 S Ct 74

(2011); *see also Aguirre*, 201 Or App at 44, 117 P3d at 1020 (discussing the "clear weight

of federal authority" on this issue).  With respect to supplemental jurisdiction, "if it appears

that the state issues substantially predominate, whether in terms of proof, of the scope of the

issues raised, or the comprehensiveness of the remedy sought, the state claims may be

dismissed without prejudice and left for resolution to state tribunals." *United Mine Workers*

*of Am. v. Gibbs*, 383 US 715, 726-27 (1996).

Because of the competing procedural aspects of the certification process under

Rule 23 and the FLSA, courts are split on whether this inherent tension creates a situation

where the state law issues substantially predominate over the federal issues.  *See*

28 - FINDINGS AND RECOMMENDATION

*Bouaphakeo*, 564 F Supp2d at 887-88 (discussing the split of authority). "District court cases permitting FLSA collective actions to proceed simultaneously with Rule 23 state actions are legion . . . As are district court cases declining supplementary jurisdiction over Rule 23 actions." *Osby v. Citigroup, Inc.*, No. Civ. 07-6085-NKL, 2008 WL 2074102, at *3 n2 (WD Mo May 14, 2008) (citing cases); *see also Williams v. Trendwest Resorts, Inc.*, No. Civ. 05-605-RCJ-LRL, 2007 WL 2429149, at *3-4 (D Nev Aug. 20, 2007) (declining to assert supplemental jurisdiction and noting that "[t]he courts are split on the issue of whether a plaintiff can bring simultaneous FLSA and state collective actions for the same underlying labor allegations.").

Courts have expressed a variety of reasons not to exercise supplemental jurisdiction over the state law claims and classes in an FLSA action, including the risk that those who affirmatively elect not to participate in the FLSA lawsuit might nonetheless be joined in the Rule 23 state action, or a concern about conflicting with Congress' purpose in enacting the procedures in the FLSA for dealing with overtime and other wage claims. *See* 1 McLaughlin on Class Actions § 2:16 (9th ed 2012) (summarizing cases).

However, "[a] significant number of courts, including the . . . Ninth Circuit[ ] . . . have deemed it appropriate to exercise supplemental jurisdiction over state-law claims of putative Rule 23 class members who had not opted into the FLSA collective action, reasoning that state-law claims are part of the same Article III case or controversy if they arose from the same employment relationship that gave rise to the FLSA claims." *Id*; *see also Calderon v. GEICO Gen. Ins. Co.*, 279 FRD 337, 344 n2 (D Md 2012) (noting that only one circuit "has declined to exercise supplemental jurisdiction over a state labor law class claim in an action where the court exercised federal question jurisdiction over a FLSA

claim" because the state claim involved "novel issues of state law."); *Knepper v. Rite Aid Corp.*, 675 F3d 249, 258-62 (3rd Cir 2012) (discussing in detail the national trend toward exercising supplemental jurisdiction over companion state claims in FLSA cases).

Indeed, in concluding that district courts have the discretion to exercise supplemental jurisdiction over state claims in an FLSA action, the Ninth Circuit adopted the District of Columbia Circuit's "skepticism of the argument that the opt-in aspect of a FLSA collective action would preclude the exercise of supplemental jurisdiction over an opt-out state law class action, stating 'we doubt that a mere procedural difference can curtail section 1367's jurisdictional sweep.'" *Wang*, 623 F3d at 761, quoting *Lindsay v. Gov't Emp. Ins. Co.*, 448 F3d 416, 424 (DC Cir 2006). In *Wang*, the court deemed supplemental jurisdiction appropriate because the state claim did not "pose novel questions of state law" and because the FLSA and state claims were "closely related." *Id*. Even though the state claim involved higher damages and more claimants, it did not substantially predominate over the federal claim because "predomination under section 1367(c)(2) relates to the *type of claim* and here the state law claims essentially replicate the FLSA claims – they plainly do not predominate." *Id* at 762 (quotation and citation omitted) (emphasis in original).

Here the operative facts are essentially the same for both the FLSA and the Oregon claims. Moreover, the state law claims are largely parallel to the FLSA claims, as they both seek redress only for wage and hour violations.

Jack in the Box expresses concern due to the conflicting procedural requirements between the FLSA and Rule 23 certification schemes. However, as discussed above, the fact that the opt-in and opt-out procedures are inherently incompatible is not enough to persuade this court that dual certification is inappropriate.

30 - FINDINGS AND RECOMMENDATION

This court is similarly not persuaded by Jack in the Box's contention that the court should essentially "wait and see" how many FLSA members elect to opt in before making a determination about supplemental jurisdiction.  Plaintiffs estimate that the putative class for the Oregon claims will consist of approximately 5,000 employees, while the FLSA class may have hundreds of thousands employees, given that they worked in Jack in the Box stores in at least 21 states.  Given the size differential between the two groups, it is highly unlikely that the nationwide FLSA collectives will be dominated by the Rule 23 Oregon classes even if only a "record low" number of employees elect to opt in.  *See* Andrew C. Brunsden, HYBRID CLASS ACTIONS, DUAL CERTIFICATION, AND WAGE LAW ENFORCEMENT IN THE FEDERAL COURTS, 29 Berkeley J. Emp. & Lab. L. 269, 292-94 (2008) (noting opt-in rates range between 2% and 89.5%, with a nationwide average of 15.71%).  Even using a conservative estimate of 2% of 200,000 putative class members opting in, the FLSA class will amount to 4,000 employees, which is nearly the size of the entire Rule 23 Oregon class.

Finally, the FLSA and Oregon claims are similar.  The FLSA claims allege overtime and minimum wage violations, while the Oregon claims allege those violations plus several other wage and hour law violations that have no counterpart in the FLSA.  In any event, Jack in the Box does not argue that the state law claims present novel areas of state law or are not otherwise sufficiently similar to those brought under the FLSA.  Without delving into the merits of each claim, it appears that the state law claims are largely premised on the same facts and similar legal standards and, thus, "likely will succeed or fail together." *McLaurin v. Prestage Foods, Inc.*, 271 FRD 465, 474 (EDNC Nov. 10, 2010). Consequently, no jurisdictional issues preclude the court from proceeding with dual certification of the Rule 23 state law class and the FLSA collective class.

31 - FINDINGS AND RECOMMENDATION

3.    **Conclusion**

Under these circumstances, the court will consider dual certification of the FLSA collective and the Rule 23 classes at the same time.  First, this court will consider whether any of the FLSA collective classes may be conditionally certified under § 216(b) and then will consider whether any class may be certified under the more exacting Rule 23 standard. Even though dual certification is permissible, it is not necessarily reasonable.  Plaintiffs would save the cost of notice by limiting both the FLSA collective class and the Rule 23 class only to those employees who worked at Jack in the Box locations in Oregon.  Then, after liability is resolved, plaintiffs could move to send notice to the FLSA collective members who worked at Jack in the Box locations outside Oregon.  However, since plaintiffs seek conditional certification of the nationwide FLSA collective class, the court will not confine its consideration of FLSA certification only to Oregon employees.

## II.    Nationwide FLSA Collectives

### A.    Proposed Collectives and Subcollectives

Plaintiffs seek conditional certification of their FLSA claims as a collective class under § 216(b) to obtain damages for various minimum wage and overtime violations. Plaintiffs ask the court to authorize nationwide notice to all potential members of the following three proposed collectives, as well as several subcollectives:

> (1) **FLSA Workers' Benefit Fund Collective**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund assessment deducted from their paycheck between December 14, 2008,[12] and February 10, 2012.

---

[12]  Plaintiffs' certification motion proposed February 2, 2008, as the beginning date for proposed FLSA collectives and subcollectives.  At oral argument, plaintiffs' counsel clarified that the February 2, 2008 date was incorrect in light of the fact that this court tolled the statute of limitations for absent putative collective class members as of December 14, 2011 (docket #59).  Consequently, the correct beginning date for the

32 - FINDINGS AND RECOMMENDATION

(a) **FLSA Workers' Benefit Fund Overtime Subcollective**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund assessment deducted from their paycheck between December 14, 2008, and February 10, 2012 that covered a workweek during which the employee worked more than 40 hours.

(2) **FLSA Shoe Collective**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck between December 14, 2008, and the present.

(a) **FLSA Shoe Minimum Wage Subcollective**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck between December 14, 2008, and the present that covered a workweek for which the wages paid to the employee averaged less than the applicable federal hourly minimum wage.

(b) **FLSA Shoe Overtime Subcollective**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck between December 14, 2008, and the present that covered a workweek during which the employee worked more than 40 hours.

(3) **FLSA Break Collective**, consisting of all current and former employees of Jack in the Box and/or its franchisees who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, between December 14, 2008, and the present.

(a) **FLSA Break Minimum Wage Subcollective**, consisting of all current and former employees of Jack in the Box and/or its franchisees who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, between December 14, 2008, and the present that covered a workweek for which the wages paid to the employee averaged less than the applicable federal hourly minimum wage (calculated including any such break(s)).

---

proposed collectives and subcollectives is December 14, 2008, three years before the tolling date. The date has been changed accordingly in each of the relevant proposed collectives and subcollectives.

33 - FINDINGS AND RECOMMENDATION

(b) **FLSA Break Overtime Subcollective**, consisting of all current and former employees of Jack in the Box and/or its franchisees who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, between December 14, 2008, and the present that covered a workweek during which the employee worked more than 40 hours (calculated including any such break(s)).

## B.    <u>Legal Standard</u>

An employee may maintain an action against an employer for violations of the FLSA on behalf of the employee and "other employees similarly situated."   29 USC § 216(b).  Although the FLSA does not define the term "similarly situated," it is a "less stringent" standard than applied under Rule 23.  *Hargrove v. Sykes Enters. Inc.*, No. Civ. 99-110-HA, 1999 WL 1279651, at *3 (D Or June 30, 1999); *see also Ballaris v. Wacker Siltronic Corp.*, No. Civ. 00-1627-KI, 2001 WL 1335809, at *2 (D Or Aug. 24, 2001).  The plaintiff need demonstrate only a reasonable basis for a claim that the employer acted on a class-wide basis.  *Sheffield v. Orius Corp.*, 211 FRD 411, 416 (D Or 2002), citing *Grayson v. K Mart Corp.*, 79 F3d 1086, 1096 (11th Cir 1996).  This burden can be satisfied by a "'modest factual showing' that plaintiffs and potential plaintiffs 'were victims of a common policy or plan that violated the law.'"  *Ballaris*, 2001 WL 1335809, at *2.

A plaintiff who seeks certification of a FLSA collective action also must show that other similarly situated employees wish to opt in to the action.  To become a party to a collective action, a person must file a written consent in the court in which the action is brought.  *Sheffield*, 211 FRD at 416.  Potential plaintiffs who do not opt in are not bound by the results of the collective action.  *Fichtner v. American Family Mut. Ins. Co.*, No. Civ. 02-6284-HO, 2004 WL 3106753, at *8 (D Or Mar. 1, 2004).

A two-step analysis is used to determine whether the employees in question are "similarly situated." *McElmurry v. US Bank Nat'l Ass'n*, No. Civ. 04-642-HU, 2006 WL 3908536, at *2. At the first step, known as the "notice stage," the court determines based on "minimal evidence" whether potential class members should be given notice of the action. *Id* at *3, citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F3d 1208, 1218 (11th Cir 2001). At this stage, plaintiffs must show only "'substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Id*, quoting *Brown v. Money Tree Mortgage, Inc.*, 222 FRD 676, 682 (D Kan 2004). The first step "results in 'conditional certification' of a representative class that allows members of the putative class to 'opt-in.'" *Id*, citing *Hipp*, 252 F3d at 1218. "Given the limited amount of evidence generally available to the court at the first stage of the proceedings, this determination is usually made 'under a fairly lenient standard and typically results in conditional class certification.'" *Smith v. T-Mobile USA, Inc.*, No. Civ. 05-5274 ABC (SSX), 2007 WL 2385131, at *4 (CD Cal Aug. 15, 2007) (citation omitted). The action then proceeds as a collective action throughout discovery.

The second step, known as the "decertification stage," is made "after discovery is largely complete and the matter is ready for trial." *McElmurry*, 2006 WL 3908536, at *3. At this step, usually precipitated by a defendant's motion for decertification, the court determines whether the possible class members are similarly situated to the named representative; if so, the representative action may proceed to trial, but if not, the court will decertify the class and dismiss the opt-in plaintiffs without prejudice and only the original plaintiffs will proceed to trial on their individual claims. *Id*. "Although the plaintiff's burden at this final stage is more strict than at the notice stage, the plaintiff need not show that opt-in

plaintiffs are identically situated," and "need not prove the merits of their claim." *Bouaphakeo*, 564 F Supp2d at 892-93 (citation and quotation omitted).

### C.     First or Second Step Analysis

At this point, plaintiffs seek only conditional certification under the first step in order to notify all potential class member of the pendency of this lawsuit and to provide them with the opportunity to opt in. However, for nearly two years prior to the filing of the class certification motion, the parties undertook exhaustive discovery. Jack in the Box produced voluminous records to plaintiffs, and the parties have taken depositions of the named plaintiffs and several representatives of Jack in the Box. *See* Opinion and Order dated August 24, 2012 (docket #114), pp. 1-4 (discussing the somewhat unique procedural course of this case, including the duration and scope of pre-certification discovery). Therefore, this case has progressed well beyond the typical notice stage where the court "makes a decision – usually based only on the pleadings and any affidavits which have been submitted." *Hipp*, 252 F3d at 1218.

This raises the issue of whether the court should skip the first step, or notice stage, and base its analysis under the stricter second step, or final stage. "Where substantial discovery has been completed, some Courts have skipped the first-step analysis and proceeded directly to the second step." *Smith*, 2007 WL 2385131, at *4 (citations omitted). However, other courts have refused to bypass step one because of the prejudice to potential plaintiffs who "might not become aware of the lawsuit and would not have an opportunity to join the suit." *Gieseke v. First Horizon Home Loan Corp.*, 408 F Supp2d 1164, 1167 (D Kan 2006), quoting *Leuthold v. Destination Am., Inc.*, 224 FRD 462, 468 (ND Cal 2004).

Since plaintiffs merely request conditional certification, the analysis should begin with the first step. However, due to the amount of discovery conducted, the intermediate

approach adopted by other courts is appropriate.   Although procedurally not making any

final decision, the court "will determine whether *conditional* certification of a collective

action is appropriate by evaluating all of the facts that have thus far been placed before it."

*Bouaphakeo*, 564 F Supp2d at 895 (emphasis in original).  Substantively, it "will ultimately

use the more onerous second stage analysis to account for all the important facts learned

through discovery that inform what putative plaintiffs, if any, are similarly situated to

existing plaintiffs."  *Id* (citations omitted).  In other words, even if the first step analysis

points to conditional certification of similarly situated plaintiffs, the court will also analyze

the relevant factors under the second step to avoid unnecessary certification of claims.

Later, after notice and completion of discovery, the certified collective class may be revised.

### D.    Conditional Certification

#### 1.    First Step

To satisfy the minimal burden at the first step of showing common identifiable facts

or legal theories with similarly situated individuals who desire to opt in, plaintiffs contend

that Jack in the Box has uniform policies that violate the FLSA.  Jack in the Box argues that

plaintiffs have failed to meet even the minimal burden necessary for conditional

certification because its shoe and meal break policies are lawful and issues specific to each

plaintiff belie a uniform policy of violating plaintiffs' rights under FLSA.  For the most

part, Jack in the Box's arguments are more relevant to the court's inquiry at the second step.

##### a.    Worker's Benefit Fund

With regard to the WBF claims, Jack in the Box does not appear to dispute that it

uses a uniform computer system for calculating the WBF assessment rate for all employees.

Nor does Jack in the Box dispute that prior to updating its system on February 10, 2012,

37 - FINDINGS AND RECOMMENDATION

employees were paying more than their share of the WBF assessment.  Instead, Jack the Box

seeks to limit the WBF collective class to Oregon, since the error affected only its Oregon

employees.  This court agrees.  Plaintiffs' objections that some of the employees might have

lived in Washington while working in Oregon, or might have since relocated to some other

state entirely, does not change the fact that the WBF error applied only to employees

working in Oregon restaurants.

Consequently, the court concludes only Jack in the Box employees who worked in

Oregon restaurants are similarly situated for purposes of conditional certification of the

WBF claims.  The wording of the proposed WBF collective and overtime violation

subcollective appears to satisfy this limitation.

**b.      Shoes**

Plaintiffs have provided evidence that the shoe claims are based on a uniform policy

that requires all employees to wear slip-resistant shoes which they can purchase through

payroll deduction.  James Depo., pp. 21, 23-24, 64-66.  This company-wide policy has been

in place for the entire time period encompassed by the proposed collective and

subcollectives.  *Id*, pp. 65-66.

Each of the named plaintiffs were required to wear Shoes for Crews slip-resistant

shoes and, on at least one occasion, ordered and paid for the shoes through a payroll

deduction.  Luchau Depo., pp. 68, 114-15, 118, 122; Tetrault Depo., pp. 60-61; A. Gessele

Depo., pp. 15-17, 60-61; J. Gessele Depo., pp. 22-23; N. Gessele Depo., pp. 63-65.  Despite

some conflicting testimony about whether employees were required to purchase shoes

through a payroll deduction or whether they could purchase them by some other means, the

evidence is clear that Jack in the Box requires its employees to wear slip resistant shoes, to

purchase these shoes themselves, and to purchase them through an approved vendor.

*Compare* Luchau Depo., pp. 126-27 (noting that employees can pay for shoes directly, but they would not get the discount available if ordered by payroll deduction) *with* J. Gessele Depo., pp. 94-95 (stating that she was not permitted to pay for the shoes herself).  For a long time, Shoes for Crews was the only approved vendor, though Jack in the Box has recently added several other vendors.  James Depo., pp. 35-36.

Plaintiffs seek to certify a shoe collective (with two subcollectives for minimum wage and overtime violations) consisting of those employees who purchased the required shoes by way of a payroll deduction.  Although the shoes are largely the same as street shoes that can be purchased elsewhere, can be worn outside of work, and can be purchased for other people, plaintiffs have presented evidence that their shoe claims are united by a single theory and similar facts.  Consequently, the shoe claims involve similarly situated employees and satisfy the first step for conditional certification.

### c.    **Breaks**

Finally, plaintiffs argue that the break claims are based on a uniform policy that applies to all employees since Jack in the Box's nationwide timekeeping system automatically fails to compensate employees for any breaks longer than 20 minutes and less than 30 minutes.  They seek to certify a break collective (with two subcollectives for minimum wage and overtime violations) consisting of all "employees of Jack in the Box and/or its franchisees who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more 'meals periods' of less than 30 minutes in the Jack's Timekeeping system."

///

39 - FINDINGS AND RECOMMENDATION

### (1).    Franchisees' Employees

As a threshold issue, the break collective, in contrast to plaintiffs' other proposed collectives, seeks to include employees of the franchisees as putative plaintiffs on the basis that Jack in the Box requires its franchisees to use its timekeeping systems.  However, Jack in the Box can only be held liable under the FLSA as an "employer" as defined in 29 USC § 203(d), including a joint employer as set forth in 29 CFR § 791.2(b).  Whether an entity is an "employer" under the FLSA is determined by applying the economic reality test which considers "the totality of the circumstances of the relationship, including whether the alleged employer has the power to hire and fire the employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."  *Hale v. State of Ariz.*, 993 F2d 1387, 1394 (9th Cir 1993) (citation omitted).  Under this test, a franchisor is not a joint employer of its franchisee by merely providing a "payroll service to a franchisee's employees."  *Singh v. 7-Eleven, Inc.*, No. Civ. 05-04534 RMW, 2007 WL 715488, at *6 (ND Cal March 8, 2007) (citation omitted).

The Second Amended Complaint does not allege that Jack in the Box is a joint employer of its franchisees' employees under the FLSA.  In apparent recognition of this omission, plaintiffs recently moved to file a Third Amended Complaint adding Oregon franchisees as defendants, alleging claims against those franchisees, and alleging that Jack in the Box and the franchisees are joint employers of the franchisees' employees (docket #149).  That motion was denied (docket #157).  Moreover, as plaintiffs readily acknowledge, the ultimate determination of whether Jack in the Box and its franchisees are joint employers will rest on discovery that has not yet been conducted.  Because this issue is

40 - FINDINGS AND RECOMMENDATION

not properly part of this case and is premature, the break collective should not include

employees of the franchisees.

**(2).    Similarly Situated**

Breaks of less than 20 minutes (paid rest breaks) and breaks of more than 30 minutes

(unpaid meal breaks) are not at issue.  Instead, the issue for certification is the alleged

failure of Jack in the Box to pay for breaks, whether designated as rest or meal breaks,

lasting more than 20 minutes and less than 30 minutes.  Under Kronos, the former

timekeeping system, any break over 20 minutes was unpaid, even if it was a meal break and

the employee was called back to work before the end of the full 30 minutes.  The newer

Jack's Timekeeping program is designed to remedy the failure of Kronos to differentiate

between rest and meal breaks by requiring employees to clock out for a meal break, which is

automatically unpaid, and requiring a manager's override if the employee clocks back in

before 30 minutes.  The manager then determines whether it was a paid rest break or unpaid

meal break and edits the employee's time sheet accordingly.  However, according to

plaintiffs, both timekeeping systems fail to ensure payment for breaks when employees are

called back to work before the end of the full 30 minutes.  Consequently, breaks lasting

between 20 and 30 minutes were not paid.  Plaintiffs contend that this time is compensable

under Jack in the Box's written policy of paying for meal breaks when employees are called

back to work early and under the FLSA for not providing a "*bona fide*" 30 minute meal

break.

Jack in the Box argues that the FLSA break claims present highly individualized

circumstances that cut against a finding that the employees are similarly situated.

Specifically, for each individual break discrepancy, Jack in the Box asserts that the court

will have to examine the reason each employee clocked in early, each employee's knowledge of Jack in the Box's break policy, whether he or she reported the discrepancy to the supervisor, and whether the supervisor did anything to correct it.  According to Jack in the Box, such an individualized inquiry prevents conditional certification.

First, it must be noted that, standing alone, "automatic meal deduction policies are not *per se* illegal" under the FLSA.  *See e.g., Wolman v. Catholic Health Sys. of Long Island, Inc.*, 853 F Supp2d 290, 301 (EDNY 2012) (citations omitted); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. Civ. 09-85J, 2011 WL 6372873, at *4 (WD PA Dec. 20, 2011) (citing cases for the "prevailing view").  Second, "there is no duty to ensure that employees are not working through unpaid meal breaks, and employers utilizing an automatic meal deduction policy may legally shift the burden to their employees to cancel the automatic deduction if they work through an unpaid meal break."  *Wolman*, 853 F Supp2d at 301 (citation omitted).  "Rather, it is the failure to compensate an employee who worked with the employer's knowledge through an unpaid meal break—whether the employee reported the additional time or not—that potentially violates the FLSA."  *Id* (citations omitted). Therefore, plaintiffs must show "that enforcement of the automatic deduction policy created a policy-to-violate-the policy."  *Camesi*, 2011 WL 6372873, at *4, citing *White v. Baptist Mem. Health Care Corp.*, No. Civ. 08-2478, 2011 WL 1883959, at *9-10 (WD Tenn May 17, 2011).

The FLSA forbids employers from requiring employees to work more than 40 hours per week without compensating employees at a higher rate.  29 USC § 207.  It does not specifically require meal breaks lasting 30 minutes.  Although not binding, the Ninth Circuit generally defers to the interpretation of the FLSA by the Department of Labor ("DOL").  *Baldwin v.*

*Trailer Inns, Inc.*, 266 F3d 1104, 1112 n4 (9th Cir 2001).  The DOL has clarified that *bona fide*

meal periods are not compensable work time under the FLSA as follows:

> *Bona fide* meal periods are not worktime.  *Bona fide* meal periods do not
> include coffee breaks or time for snacks. These are rest periods.  The
> employee must be completely relieved from duty for the purposes of
> eating regular meals.  Ordinarily 30 minutes or more is long enough for a
> *bona fide* meal period.  A shorter period may be long enough under special
> conditions.  The employee is not relieved if he is required to perform any
> duties, whether active or inactive, while eating.

29 CFR § 785.19(a).

The parties disagree as to the appropriate test for determining whether a meal period is

*bona fide*.  Jack in the Box cites cases which generally apply the "predominate benefit test"

which examines whether an employee's activities while on break are for the benefit of the

employer or the employee.  *See Frank v. Gold'n Plump Poultry, Inc.*, No. Civ. 04-1018-

PJS/RLE, 2007 WL 2780504, at *7-9 (D Minn Sept. 24, 2007); *Mendez v. Radec Corp.*, 232

FRD 78, 84 (WD NY 2005); *Reich v. S. New. Eng. Telecomm. Corp.*, 121 F3d 58, 64 (2nd Cir

1997).  Plaintiffs contend that the Ninth Circuit has adopted the "completely relieved from duty

standard" which requires that "[a]n employee cannot be docked for lunch breaks during which he

is required to continue with any duties related to his work."  *Brennan v. Elmer's Disposal Serv.,*

*Inc.*, 510 F2d 84, 88 (9th Cir 1975).  However, as noted by one court, "[t]he Ninth Circuit has not

directly addressed either test since deciding *Brennan*, except for a brief reference in *Alvarez v.*

*IBP, Inc.*, 339 F3d 894, 913, *aff'd* 534 US 1144 (2005), wherein the court compared the two

FLSA-based standards with Washington's administrative code governing 30-minute meal

breaks."  *Busk v. Integrity Staffing Solutions, Inc.*, No. Civ. 10-1854-RLH, 2011 WL 2971265, at

*5 n3 (D Nev July 19, 2011).

Regardless of which standard the Ninth Circuit would apply, both standards require individualized determinations for each unpaid break between 20 and 30 minutes.  Such an inquiry requires the court to consider, for each unpaid break, the circumstances surrounding the individual employee's return to work before the full 30 minute period had elapsed and whether the employee's activities while on break were for the "predominate benefit" of the employer or whether the employee was "completely relieved from duty" while on break.  Such an inquiry might include consideration of, among other things, the length of the break, whether the employee had finished eating when called back, whether the employee left the premises, who called the employee back, and whether the employee engaged in any work related activity while on break, regardless of its length.  *See Prise v. Alderwoods Group, Inc.*, 817 F Supp2d 651, 681 (WD Pa 2011) (noting that determination of a *bona fide* meal break includes consideration of "the time, frequency, and duration of the interruptions, as well as whether the employee received compensation for a meal break").

Jack in the Box has presented a chart listing all the instances where the named plaintiffs had meal breaks of less than 30 minutes.  Parker Decl., Ex. Y.  This document indicates that many of these breaks were 28 or 29 minutes in duration.  The chart does not indicate why the employee's break was shortened, such as being called back to work early (a potential FLSA violation) or mistakenly punching in early after finishing an otherwise *bona fide* meal break.  Jack in the Box argues that such an inquiry is fact-specific and problematic for treatment as a collective action.

However, the focus of the inquiry at this first stage is "not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated . . . with respect to their allegations that the law has been violated."  *Brabazon v. Aurora*

*Health Care, Inc.*, No. Civ. 10-714, 2011 WL 1131097, at *3 (ED Wis March 28, 2011),

quoting *Young v. Cooper Cameron Corp.*, 229 FRD 50, 54 (SDNY 2005). The named

plaintiffs performed similar job duties, were subject to Jack in the Box's uniform

timekeeping policies, and had meal breaks of less than 30 minutes due to an allegedly

common practice of being called back to work early.

In support, each of the named plaintiffs attests that during the course of their

employment with Jack in the Box, they were called back early from their meal breaks at

least "occasionally." Luchau Depo., pp. 144-47 (as a team leader or an assistant manager,

she clocked back in "occasionally" when needed); J. Gessele Depo., pp. 54, 80-81 (as a

team leader she would "occasionally" return early from her break if the restaurant was

busy); N. Gessele Depo., pp. 55-58 (she recalled a "couple" of times when she did not get

her full meal break because she was called back early or had no time to take one);

A. Gessele Depo., pp. 38-39, 42, 48 (as an hourly employee, she took her breaks when told

to take them, but would "sometimes" be called back early when the restaurant was busy).

One named plaintiff recalls that she was called back early "a whole lot of times" and usually

was not permitted to make up the time later on in that shift. Tetrault Depo., pp. 47-48.

They do not otherwise recall the circumstances surrounding those instances where their breaks

were less than 30 minutes. Especially difficult is their inability to recall whether a particular

break was short due to being called back to work early or due to simply clocking back in a few

minutes early. Of course, once Kronos was replaced by Jack's Timekeeping system, an

employee could no longer clock in early from a meal break by mistake.

However, the fact that some of the named plaintiffs were called back to work more

frequently than others or that they do not recall the precise circumstances that cut their meal

break short, does not, without more, demonstrate that they were not the "victims of a common policy or plan that potentially runs afoul of the FLSA." *Brabazon*, 2011 WL 1131097, at *4. The important point is that all testified to a common practice of being called back from their meal breaks earlier than was authorized by Jack in the Box's written policy and typically when the restaurant was busy. If more than 20 minutes had elapsed after they clocked out for their meal break, they were not paid for that time. In essence, they are challenging an unwritten policy to draw the line between paid (rest) and unpaid (meal) breaks at 20 minutes, in violation of a written policy to compensate them for breaks less than 30 minutes.

At this first step, plaintiffs satisfy the relatively lenient standard of being similarly situated by demonstrating a common policy or practice regarding breaks. *See id* (conditionally certifying FLSA collective class based on failure to compensate on-duty meal period). However, as discussed below, discovery to date reveals that they cannot satisfy the significantly higher burden at the second step for certification. *See e.g., Camilotes v. Resurrection Health Care Corp.*, No. Civ. 10-366, 2012 WL 4754743 (ND Ill Oct. 4, 2012) (decertifying FLSA collective action that had been previously conditionally certified for requiring plaintiffs to work through meal breaks without payment); *Camesi*, 2011 WL 6372873 (same); *Frye v. Baptist Mem'l Hosp., Inc.*, No. Civ. 07-2708, 2010 WL 3862591 (WD Tenn Sept. 27, 2010) (same).

### 2.  **Second Step**

Keeping in mind that the "first step analysis generally informs the court that conditional certification is appropriate," but also keeping in mind the parties' extensive discovery, this court will analyze the relevant factors under the second step, taking into

account "all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated."  *Bouaphakeo*, 564 F Supp2d at 895, 897.

Courts consider the following three factors at the second step:  "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F3d 1095, 1103 n4 (10th Cir 2001), *cert denied*, 536 US 934 (2002).  The court must evaluate these factors while keeping in mind the purpose of § 216(b):  "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity."  *Bouaphakeo*, 564 F Supp2d at 892-93 (citation and quotation omitted).

### a.    Factual and Employment Settings

Under the first factor, courts should inquire into "whether Plaintiffs have provided evidence of a company-wide policy which may violate the FLSA, as well as an assessment of Plaintiffs' job duties, geographic location, supervision, and salary."  *Rawls v. Augustine Home Health Care, Inc.*, 244 FRD 298, 300 (D Md 2007).  The plaintiffs and the putative class members work at different stores under different managers in as many as 21 states. Despite these disparate employment settings, they have largely the same job duties and are subject to the same policies.

As noted above, the particular WBF deduction at issue applied only to Oregon employees, and thus, is not a nationwide policy.  However, the proposed collective includes only those employees working in Oregon stores who were subject to the same program until it was updated on February 10, 2012.

47 - FINDINGS AND RECOMMENDATION

Jack in the Box's shoe policy applies nationwide.  All employees working in Jack in the Box's restaurants are required to purchase slip-resistant shoes from an approved vendor that meet Jack in the Box's coefficient of friction requirements.  The record contains conflicting evidence about whether employees are permitted to purchase the shoes on their own or by a payroll deduction.  But if purchased through a payroll deduction, Jack in the Box pays for the shoes and deducts the price of the shoes from the employee's wages over four paychecks.  This is true regardless of how many hours an employee works in a particular week, where the store is located, or the employee's particular job title.

Jack in the Box's break policy also applies nationwide.  All employees are required to take statutory breaks, must clock in and out for those breaks, and are subject to the same timekeeping system.  Though the precise parameters of the length, timing, and type of breaks varies by state, there is no evidence that the types of breaks differ in any way based on the employee's duties.

Consequently, the named plaintiffs are all subject to the same WBF, shoe, and break policies, regardless of their job title, specific job responsibilities, or geographic location.

### b.    Defenses

The second factor is the extent to which potential defenses are individual to each plaintiff.  "The presence of many individualized defenses makes a representative class unmanageable[.]"  *White*, 2011 WL 1883959, at *12.  However, "[w]here plaintiffs' factual and employment settings are similar, these defenses do not necessarily render collective treatment unmanageable."  *Frye*, 2010 WL 3862591, at *9.

Jack in the Box vigorously opposes certification of the shoe and break collectives on the basis that disparate facts among employees give rise to individualized defenses that render collective treatment improper.

First, with regard to the shoe claims, the parties argue whether the policy at issue actually violates the FLSA.  Essentially, they dispute whether the required slip resistant shoes are a "uniform" or "other facilities" as defined by the FLSA.  If the shoes are part of a "uniform," then their cost may not be passed on to employees.  Similarly, if the shoes are "other facilities," then Jack in the Box's payroll deduction is permissible if Jack in the Box does not "profit" from the deduction and if the deduction is for the employees' benefit.  The parties vigorously dispute whether the required shoes are part of a uniform, whether Jack in the Box actually receives a profit from the $2.00 reimbursement received from the shoe companies for each pair of shoes ordered by a payroll deduction, and whether the deduction is for the employees' benefit.  Regardless of the merits of these arguments, these defenses are not particularized to each individual plaintiff.  Instead, resolution of these issues uniformly applies to all employees and, thus, do not weigh against collective treatment.

With respect to the break claims, Jack in the Box again raises the specter of an individualized inquiry that it deems central to resolving whether employees had *bona fide* meal breaks.  Similar considerations are also relevant to resolving two other related defenses, namely whether the breaks were less than 30 minutes due to "special conditions" and whether the time at issue is *de minimis* and non compensable.  At issue is whether Jack in the Box has violated the FLSA by automatically treating breaks of more than 20 minutes as unpaid meal breaks despite calling employees back to work early.

Unlike the analysis at the first step, the critical issue at the second step is why an employee's 30 minute break was cut short.  If all unpaid breaks between 20 and 30 minutes were not *bona fide* meal breaks due to Jack in the Box's unwritten, but enforced, policy of calling employees back to work early, then a collective action may be appropriate.   However, as numerous other courts have concluded, determining whether meal breaks are *bona fide* rests on a number of individualized questions.  *Camesi*, 2011 WL 6372873, at *10 (20-minute policy for payment of breaks outweighed by "the myriad of individualized inquiries required for collective action recovery"); *Prise*, 817 F Supp2d at 681 (individualized defenses include "whether the employee was required to perform work for [her employer] during a meal break, [and] whether the particular meal break was a bona fide meal break, including the time frequency and duration of interruptions and whether the employee received compensation for a meal break.").

Some short breaks under the Kronos timekeeping system may have been due to an employee mistakenly clocking back in early which is not an FLSA violation.   Jack's Timekeeping fixed that problem by not allowing meal breaks less than 30 minutes without a manager's override.  However, even under Jack's Timekeeping, a manager has the discretion whether to convert a 20-30 minute unpaid meal break to a paid rest break.  "When alleged FLSA violations stem from the enforcement decision of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate." *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. Civ. 10-592, 2011 WL 4351631, at *7-8. *See also MacGregor v. Farmers Ins. Exch.*, No. Civ. 2:10-CV-03088, 2011 WL 2981466, at *3-4 (D SC July 22, 2011) (citing cases); *White*, 2011 WL 1883959, at *9-10 (holding that plaintiffs needed to show "that enforcement of the automatic deduction policy" was such that the employer "in fact, shirked its FLSA responsibility").

Plaintiffs argue that Jack in the Box has uniform policies that inform managers and employees about when and for how long to send employees on break and a uniform timekeeping system that does not pay employees for breaks that last between 20 and 30 minutes. However, this system is not nearly as rigid as plaintiffs assert. Many of the individual plaintiffs were responsible for scheduling and ensuring that other hourly employees on their shift took their meal and rest breaks. J. Gessele Depo., pp. 47-49; N. Gessele Depo., pp. 43-44, 54-58. Each of these plaintiffs recalled that at the beginning of each shift, they would attempt to sketch out the timeframe for sending employees on their breaks, but that this was always subject to change depending on whether the restaurant was busy. *Id*. Some of the plaintiffs testified that when their breaks were cut short, their manager would sometimes try to make up that time later in the shift, but was not always able to do so depending on the demands of the restaurant. Luchau Depo., pp. 106, 111-13; Tetrault Depo., p.48. Luchau, who served as a team leader and as an assistant manager, sometimes edited employee time cards to reflect a full 30 minute break even if was shorter and recalled "quite a few times that employees would not get their breaks" because the restaurant was too busy. Luchau Depo., pp. 93-94, 96, 111-13.

None of the evidence submitted leads to the reasonable conclusion that Jack in the Box had any "unwritten policy" requiring supervisors to call employees back early from their meal breaks in violation of the FLSA, as opposed to decentralized and independent misconduct by some supervisors. The testimony by each named plaintiff supports, at best, isolated and sporadic meal breaks of slightly less than 30 minutes without any evidence of threats or inadequate training to enforce consistent behavior by management contrary to established policies. In fact, the named plaintiffs who acted as managers felt responsible to ensure that their subordinates received 30 minute meal breaks through proper scheduling, never asked their

subordinates to takes less than 30 minutes breaks, and never heard any complaints that employees were being shorted on breaks.  J. Gessele Depo., pp. 48-49, 54-55; N. Gessele Depo., pp. 43-44, 62-63; Luchau Depo., pp. 91-93; A. Gessele Depo., p. 49.

Consequently, for each individual break between 20 and 30 minutes, the court must examine the reason the employee clocked in early to determine if the 20-30 minute break was a *bona fide* meal break, whether the employee reported the discrepancy to the supervisor, and whether the supervisor did anything to correct it.  Each employee's action and each supervisor's action are essential to determining any FLSA violation with respect to unpaid breaks.   This individualized inquiry is central to resolution of the issue of whether employees had uncompensated breaks.

Consequently, based on this record, the second factor precludes certification of the break claims as a collective FLSA action.

### c.    Fairness, Manageability and Procedural Considerations

The third factor requires consideration of the primary objectives of FLSA collective actions to lower costs to the plaintiffs and efficiently resolve common issues of law and fact.  *Bouaphakeo*, 564 F Supp2d at 892-93.  The court must also determine "whether it can manage the class in a manner that does not cause prejudice to any party."  *Crawford v. Lexington-Fayette Urban Cty. Gov't*, No. Civ. 06-299-JBC, 2008 WL 2885230, at *11 (ED Ky July 22, 2008).

Jack in the Box does not contest the benefits of a FLSA collective action with respect to the WBF claims which are limited to employees who worked at Oregon restaurants.  It does question, however, the benefit of a nationwide FLSA collective action for the shoe claims.  Jack in the Box has nationwide policies pertaining to the kinds of shoes required

52 - FINDINGS AND RECOMMENDATION

and the purchasing of shoes by payroll deduction.  Even though the parties have engaged in significant discovery, that discovery has always been limited to Oregon employees. Presumably, if permitted discovery outside of Oregon, plaintiffs would be able to provide evidence of Jack in the Box employees who ordered shoes by payroll deduction.

As mentioned above, the court sees some wisdom in limiting conditional certification only to Oregon employees in order to curb the cost of sending notice nationwide.  However, knowing they must bear the cost of this notice, plaintiffs seek nationwide certification. Thus, the court's misgivings on this issue are not enough to deny nationwide certification. Consequently, this factor generally weighs in favor of permitting conditional certification of the nationwide shoe collectives.

Jack in the Box raises one other issue that must be addressed, namely a 2011 settlement in a similar class action case in California which affects individuals employed by California stores between June 10, 2004, and March 2, 2011.  Parker Decl., Exs. W & X; Second Egan Decl. (docket # 128) Exs. 34-37.  As part of the settlement agreement, those plaintiffs have released all wage claims that could have been brought by them under the FLSA.  Consequently, according to Jack in the Box, these potential putative plaintiffs are not eligible to participate in this case and should be omitted them from any FLSA collectives or subcollectives that might be certified in this case on the basis of release and *res judicata*.[13]  In support of this argument, Jack in the Box cites only *Ho by Ho v. San Francisco Unified Sch. Dist.*, 965 F Supp 1316, 1322 (ND Cal 1997), for the principle that the privity element of a *res judicata* defense is satisfied where the prior action involved a

_____

[13] Plaintiff contends that release and *res judicata* are affirmative defenses which do not appear in Jack in the Box's Answer.  However, the court permitted Jack in the Box to file an Amended Answer which does allege these affirmative defenses.

class or representative action consent decree and the plaintiff in the subsequent action was found to be a member of the class action.  Though this case does stand for this principle, the *res judicata* arguments were addressed at the summary judgment stage.  Jack in the Box has provided no authority that persuades this court to resolve the impact of the California settlement at this juncture.  Consequently, the court declines to carve out a limitation to the proposed national collectives at the certification stage.

### III.    Oregon FRCP 23(b)(3) Classes

#### A.    Proposed Classes and Subclasses

Plaintiffs move to certify the following three proposed classes and several subclasses under Rule 23(b)(3) to obtain damages for violations of Oregon law:

> (1) **Oregon Workers' Benefit Fund Class**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund ("WBF") assessment deducted from a paycheck between August 13, 2004, and February 10, 2012.[14]

>> (a) **Oregon WBF Unpaid Wages Subclass**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund assessment deducted from a paycheck between August 13, 2004, and February 10, 2012.

>> (b) **Oregon WBF Minimum Wage Subclass**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund assessment deducted from a paycheck between August 13, 2004, and February 10, 2012 that covered a workweek for which the wages paid to the employee on payday averaged less than the applicable Oregon hourly minimum wage.

>> (c) **Oregon WBF Overtime Subclass**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund assessment deducted from a paycheck between August 13, 2008, and February 10, 2012 that covered a workweek during which the employee worked more than 40 hours.

---

[14] Since Jack in the Box had no employees in Oregon after September 31, 2011 (Klusek Depo., p. 21), it appears that no putative plaintiff in any of the proposed FRCP 23(b)(3) classes will be able to recover any damages after that date.

54 - FINDINGS AND RECOMMENDATION

(d) **Oregon WBF Unpaid Wages Upon Termination Subclass**, consisting of all current and former employees of Jack in the Box whose employment terminated on or after August 13, 2004, and who had an Oregon Workers' Benefit Fund assessment deducted from a paycheck between August 13, 2004, and February 10, 2012.

(e) **Oregon WBF Wrongful Deductions Subclass**, consisting of all current and former employees of Jack in the Box who had an Oregon Workers' Benefit Fund assessment deducted from a paycheck between August 13, 2004, and February 10, 2012.

(2) **Oregon Shoe Class**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck on or after August 13, 2004, that covered work performed in Oregon.

(a) **Oregon Shoe Unpaid Wages Subclass**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck on or after August 13, 2004, that covered work performed in Oregon.

(b) **Oregon Shoe Minimum Wage Subclass**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck on or after August 13, 2004, that covered work performed in Oregon and included any workweek for which the wages paid to the employee on payday averaged less than the applicable Oregon hourly minimum wage.

(c) **Oregon Shoe Overtime Subclass**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck on or after August 13, 2008, that covered work performed in Oregon and included any workweek during which the employee worked more than 40 hours.

(d) **Oregon Shoe Unpaid Wages Upon Termination Subclass**, consisting of all current and former employees of Jack in the Box whose employment terminated on or after August 13, 2004, and who had a deduction to pay for shoes taken from a paycheck on or after August 13, 2004, that covered work performed in Oregon.

(e) **Oregon Shoe Wrongful Deductions Subclass**, consisting of all current and former employees of Jack in the Box who had a deduction to pay for shoes taken from a paycheck on or after August 13, 2004, that covered work performed in Oregon.

(3) **Oregon Break Class**, consisting of all current and former employees of Jack in the Box who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or

who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, in Oregon during any workweek the regular payday for which was on or after August 13, 2004.

(a) **Oregon Break Unpaid Wages Subclass**, consisting of all current and former employees of Jack in the Box who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, in Oregon during any workweek the regular payday for which was on or after August 13, 2004.

(b) **Oregon Break Minimum Wage Subclass**, consisting of all current and former employees of Jack in the Box who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, in Oregon during any workweek the regular payday for which was on or after August 13, 2004, and for which the wages paid on payday averaged less than the applicable Oregon hourly minimum wage (calculated including the time for such break(s)).

(c) **Oregon Break Overtime Subclass**, consisting of all current and former employees of Jack in the Box who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, in Oregon during any workweek the regular payday for which was on or after August 13, 2008, and in which the employee worked more than 40 hours (calculated including the time for such break(s)).

(d) **Oregon Break Unpaid Wages Upon Termination Subclass**, consisting of all current and former employees of Jack in the Box whose employment terminated at any time on or after August 13, 2004, and who clocked out for one or more breaks of more than 20 but less than 30 minutes in length in any timekeeping system, and/or who clocked out for one or more "meal periods" of less than 30 minutes in the Jack's Timekeeping system, in Oregon during any workweek the regular payday for which was on or after August 13, 2004.

///

///

///

56 - FINDINGS AND RECOMMENDATION

B.     **Legal Standard**

Plaintiffs seeking to represent a class under Rule 23 must satisfy the threshold

requirements of subsection (a) that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact are common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

The class must also fall within one of the three categories listed in subsection (b).  Here

plaintiffs seek class certification of the Oregon claims under subsection (b)(3) which requires

that:

> questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Plaintiffs bear the burden of demonstrating that each element of Rule 23 is satisfied.

*Hanon v. Dataproducts Corp.*, 976 F2d 497, 508 (9th Cir 1992).  While the primary focus is not

on the merits of the plaintiff's claims, courts "must perform 'a rigorous analysis [to ensure] that

the prerequisites of Rule 23(a) have been satisfied.'"  *Ellis v. Costco Wholesale Corp*., 657 F3d

970, 980 (9th Cir 2011), quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S Ct 2541, 2551 (2011).  As

the Supreme Court has stressed, "Rule 23 does not set forth a mere pleading standard.  A party

seeking class certification must affirmatively demonstrate his compliance with the Rule—that is,

he must be prepared to prove that there are in fact sufficiently numerous parties, common

questions of law or fact, *etc*."  *Wal-Mart*, 131 S Ct at 2551.  In addition, the court's "rigorous

analysis" under FRCP 23 frequently "will entail some overlap with the merits of the plaintiff's

underlying claim.  That cannot be helped."  *Id*.  To determine whether class certification is

proper, the court may consider material beyond the pleadings and require supplemental

evidentiary submissions by the parties. *Blackie v. Barrack*, 524 F2d 891, 901 n17 (9th Cir 1975).

### C.    Rule 23(a) Requirements

During oral argument on June 14, 2012, Jack in the Box conceded that plaintiffs satisfy

the requirements of Rule 23(a) as to numerosity.   Thus, the remaining issues regarding the

threshold requirements are commonality, typicality, and adequacy of the representation.   These

remaining requirements focus on "whether under the particular circumstances maintenance of a

class action is economical and whether the named plaintiff's claim and the class claims are so

interrelated that the interests of the class members will be fairly and adequately protected in their

absence." *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 188

FRD 365, 373 (D Or 1998), citing *General Tele. Co. of Sw. v. Falcon,* 457 US 147, 157, n13

(1982) (noting that these three requirements "tend to merge.").

### 1.    Commonality and Typicality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."

This standard is not strictly construed, but "has been construed permissively.   All questions of

fact and law need not be common to satisfy the rule.   The existence of shared legal issues with

divergent factual predicates is sufficient, as is a common core of salient facts coupled with

disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F3d 1011, 1019 (9th

Cir 1998).   The Supreme Court has recently clarified the commonality requirement, at least in

employment discrimination cases, by requiring "the plaintiff to demonstrate that the class

members 'have suffered the same injury.'" *Wal-Mart*, 131 S Ct at 2551 (quotation omitted).

"This does not mean merely that they have all suffered a violation of the same provision of law,"

but instead that their claims "depend upon a common contention . . .  of such a nature that it is

58 - FINDINGS AND RECOMMENDATION

capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Although "[e]ven a single [common] question will do," *id* at 2556 (internal citation and quotation marks omitted), "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id* at 2551 (emphasis omitted).

Rule 23(a)(3) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is similar to the commonality requirement. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F3d at 1020. Although the claims of the class representative need not be identical to the claims of other class members, the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 US at 156 (internal quotation marks and citation omitted).

### a.    Oregon WBF Class

Jack in the Box does not directly challenge certification of the WBF class and subclasses on the basis of commonality or typicality, but instead reiterates its general concerns regarding timing, manageability of the class, and the lack of a class representative at certain times which are addressed elsewhere.

Plaintiffs assert that the WBF claim presents common questions of fact since all Jack in the Box employees working at Oregon stores had the WBF assessment deducted from their paycheck. The only difference between the proposed class members is the amount deducted from their paychecks which changed from year to year as determined by the State of Oregon.

59 - FINDINGS AND RECOMMENDATION

However, the WBF assessment was uniformly deducted from all employee paychecks by way of a standardized computer system.

Plaintiffs allege that Jack in the Box's share of the WBF assessment was not properly updated in the computer system, resulting in Jack in the Box paying less than half of its share and employees paying more than half of their share. The proof will be common to all the class members by comparing the WBF assessment deducted from paychecks and paid by Jack in the Box during the relevant period. Consequently, all employees working at Oregon Jack in the Box stores during the relevant period suffered the same injury and possess the same interest in recouping the amount they overpaid, if any. Such an injury is capable of classwide resolution. Thus, the WBF claims satisfy the commonality and typicality requirements.

### b.    Oregon Shoe Class

Jack in the Box argues that the commonality and typicality elements necessary for class certification are not met for the shoe claims due to: (1) highly individualized issues of proof regarding whether employees provided written authorization for the payroll deduction; (2) factual differences between the plaintiffs with some ordering shoes on behalf of other employees, some not filling out authorization forms, and some not being required to purchase shoes by payroll deduction; and (3) Oregon law permitting payroll deductions for the employee's benefit. Plaintiffs respond that these arguments largely amount to affirmative defenses which go to the merits and are inappropriate for consideration at this stage.

Jack in the Box's arguments focus on ORS 652.610(3)(b) which is the statute relevant to the wrongful deduction subclass. Notably, Jack in the Box does not specifically take issue with any of the other statutes relevant to the subclasses for minimum wage (ORS 653.025), overtime

(ORS 653.261), unpaid wages upon termination (ORS 652.140), and general unpaid wages (ORS 652.120) violations.

According to ORS 652.610(3)(b), "[a]n employer may not withhold, deduct or divert any portion of an employee's wages unless . . . the deductions are authorized in writing by the employee, are for the employee's benefit and are recorded in the employer's books."  Thus, a Jack in the Box employee who filled out a written authorization form cannot recover under Oregon law for the allegedly wrongful payroll deductions for buying shoes.  Jack in the Box points to conflicting evidence in the record about whether employees were required to fill out a written authorization form and whether they actually filled out such a form.  Since this must be resolved on an individualized basis, it contends that the shoe claims are not capable of classwide resolution.  This issue is complicated by the fact that when Jack in the Box transferred its stores to franchisees, this paperwork was lost or destroyed.[15]

Resolution of this issue is an affirmative defense that goes to the merits of plaintiffs' claims which is not appropriate at this stage.  Each of the named plaintiffs recalled ordering shoes by payroll deduction, and at least two plaintiffs testified that they never filled out the written authorization form.  *See* Luchau Depo., pp. 116-17; J. Gessele Depo., pp. 95-97. Conflicting evidence about whether individual employees actually filled out the payroll deduction authorization form does not necessarily defeat commonality and typicality because the court can always limit the class to those who did not sign an authorization.   Whether Jack in the Box improperly deducted the cost of the shoes from employee paychecks without written

---

[15]  Though plaintiffs ask the court to sanction Jack in the Box for the loss and destruction of these forms on the grounds of spoliation of evidence, they have not filed a motion to this effect.  Since spoliation is not otherwise relevant to class certification, it is not further considered at this juncture.

authorization is an issue common among the class members.  *See Willis v. Ironwood Comm., Inc.*, No. Civ. 07-1252-KI, 2008 WL 2167175, at *3 (D Or May 22, 2008).

Jack in the Box also contends that the wrongful deduction claim fails as a matter of law since ORS 652.610(3)(b) permits such deductions so long as they "are for the employee's benefit."  The parties spend a significant amount of effort arguing about statutory construction and whether this statute requires the deduction to be solely for the employee's benefit.  Again, these arguments go to the merits of the claims which is inappropriate at this juncture.  Additionally, resolution of this issue is capable of classwide resolution since whether the deduction was "for the employee's benefit" under Oregon law will affect all members of the shoe classes equally.

Finally, Jack in the Box argues that the shoe classes lack typicality because those plaintiffs who were responsible for enforcing Jack in the Box's shoe policies were part of the problem.  Specifically, those employees who had at least some management responsibility were required to ensure that employees ordered shoes by a payroll deduction and should have asked employees to complete the payroll deduction forms.  This creates a situation where some class members' claims may be antagonistic to other class members claims.  However, the focus of the court's analysis when analyzing typicality is whether the "interest of the named representative aligns with the interest of the class" and generally "refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon*, 976 F2d at 508 (citation and quotation omitted).   Jack in the Box's argument focuses more on the facts giving rise to the plaintiffs' claims, not on whether the named plaintiffs' interests are generally aligned with those of the putative class members.  In fact, their interests are closely aligned since all employees are subject to the same shoe policy which includes

allowing or requiring employees to purchase shoes by way of a payroll deduction. Such a claim

is common to all class members, as well as typical across the class. The individual

circumstances surrounding whether a particular employee was asked to fill out a payroll

deduction form does not create "a danger that absent class members will suffer if their

representative is preoccupied with defenses unique to it," since this fact may well be common

amongst many class members. *Id* (citation and quotation omitted). Should it become necessary

to do so, the court can always create subclasses. At this stage, the shoe claims satisfy the

elements of commonality and typicality.

### c.    Oregon Break Class

Jack in the Box contends that the break class and subclasses do not meet the commonality

and typicality requirements necessary for class certification because: (1) none of the named

plaintiffs were employed by Jack in the Box July 1, 2010, when Oregon first created a private

right of action for meal break claims under OAR 839-020-0050; and (2) whether employees were

completely relieved of duty is a highly individualized inquiry. Plaintiffs respond that whether,

and on what date, Oregon recognized a private right of action for meal break claims goes to the

merits and is not appropriate for consideration at this stage and that resolution of this legal issue

will be common to all members.

Plaintiffs are correct that resolution of whether they have a claim under Oregon law for

their meal break claims presents an issue common to all the class members. However, resolution

of this issue at this stage is essential since the absence of any claim under Oregon law eliminates

any common issue. Allowing certification to proceed on a claim that does not exist is not

consistent with the required "rigorous analysis" required under FRCP 23. *Wal-Mart*, 131 S Ct at

2551.  Consequently, the court will resolve whether plaintiffs have a cause of action for paid

breaks before turning to the individualized issues presented by the break claims.

**(1).**   <u>**Cause of Action**</u>

Plaintiffs contend that regardless of whether a statutory private right of action existed

prior to July 1, 2010, they assert a contractual right to be paid for any break fewer than 30

minutes.  In support, plaintiffs point to the On Duty Meal Policy signed by Luchau on

February 20, 2006, which reads as follows:

> I hereby agree with my employer that on those sporadic occasions
> when the nature of my work prevents me from being relieved of all
> duties during my required meal period, I shall be paid for those meal
> periods.  I may revoke this agreement in writing at any time.

Egan Decl., Ex. 30.

Oregon requires that employees who have worked at least six hours are entitled to "a

meal period of not less than 30 continuous minutes during which the employee is relieved of all

duties.  OAR 839-020-0050(2)(a).  Thus, plaintiffs contend that 30 minutes is the "required meal

period" referenced in the On Duty Meal Policy which Jack in the Box contractually agreed to

pay its Oregon employees.   Based on this policy, plaintiffs argue that they have a breach of

contract claim, rendering a private right of action under the regulation irrelevant.

However, plaintiffs overlook the fact that they have not pled a breach of contract claim.

In addition, the On Duty Meal Policy appears in a single employee's employment file.  Plaintiffs

have provided no evidence as to whether this policy rises to the level of a company-wide

contractual obligation.  *Wren v. RGIS Inventory Specialists*, No. Civ. 06-5778-JCS, 2009 WL

2612307, at *18 (ND Cal Aug. 24, 2009) (discussing whether, under Oregon law, a policy

included in an employee handbook can give rise to a contractual obligation to provide meal

breaks in accordance with the company's written policy).  Consequently, based on the current

64 - FINDINGS AND RECOMMENDATION

record, plaintiffs may not recover damages related to meal breaks based on a breach of contract theory.

Oregon employees have always had a private right of action to recover for time worked for which they were not paid. ORS 653.055. The legislature explicitly authorized BOLI to regulate meal and rest breaks, ORS 653.261, and pursuant to this authority, OAR 839-020-0050, mandates meal and rest breaks. *See Gafur v. Legacy Good Samaritan Hosp. & Med. Ctr.*, 213 Or App 343, 346-47, 161 P3d 319, 320-21 (2007), *aff'd in part, rev'd in part*, 344 Or 525, 185 P3d 446 (2008). OAR 839-020-0050 has gone through several revisions since it was first enacted. Jack in the Box argues that not until the current version of the regulation was enacted on July 1, 2010, after the *Gafur* decisions, did employees obtain a private right of action for meal and rest break violations. The parties dispute whether the *Gafur* holdings bar plaintiffs' meal break claims.

The plaintiffs in *Gafur* were hospital employees who were not provided meal and rest breaks during work periods. The trial court dismissed both the meal and rest break claims because the statutes on which plaintiffs based their complaint did not confer a private right of action. The Court of Appeals affirmed in part and reversed in part, concluding that the plaintiffs did not have a private right of action for unpaid meal breaks, but did have a private right of action for unpaid rest breaks. With regard to the meal break claims, the court concluded that "OAR-839-020-0050[ ] requires meal breaks but not *paid* meal breaks." *Id*, 213 Or App at 348, 161 P3d at 321 (emphasis in original). The employer did not seek review of the court's conclusion regarding meal breaks, and the Oregon Supreme Court explicitly limited its opinion to unpaid rest periods. *Gafur*, 344 Or at 528 n3, 185 P3d at 448 n3. The Supreme Court ultimately held that "OAR 839-020-0050[ ] requires employers to provide minimum rest breaks

but violation of that requirement does not give rise to a wage claim under ORS 653.055 for additional wages based on missed rest breaks." *Id*, 344 Or at 538, 185 P3d at 453.

The Oregon Court of Appeals later characterized the *Gafur* decisions as establishing only "that there is no private right of action by an employee for either *unprovided* rest breaks or *unprovided* meal breaks." *Rogers v. RGIS, LLP*, 232 Or App 433, 434, 222 P3d 710, 711 (2009) (emphasis added); *see also Wren*, 2009 WL 2612307, at *17 n11 (characterizing *Gafur* as holding that "under Oregon wage and hour statutes, there is no private right of action for missed meal breaks.") It explicitly noted that *Gafur* did not establish "no private right of action by an employee for either *unpaid* rest breaks or *unpaid* meal breaks." *Id* (quotation and citation omitted) (emphasis in original). Thus, the distinction between unprovided and unpaid breaks is significant.

Plaintiffs' break claims are not premised on missing breaks since each of the named plaintiffs were permitted breaks. Instead, they are based on a failure to pay for those breaks which were not *bona fide* meal breaks. This distinction was significant to the Court of Appeals even at the time it considered *Gafur*. It took great care to point out that while plaintiffs contended that their claims "were based on the allegation that they were not paid for meal breaks during which they worked," this allegation was actually from an amended complaint that was not properly filed with the trial court and thus, not before the appeals court. Instead, the court was bound by the allegations in the original complaint "that defendants did not provide them meal breaks and did not pay them for the time that they would have spent on those breaks." *Gafur*, 213 Or App at 347-48, 161 P3d at 321. Thus, *Gafur* does not extend to cases where, as here, plaintiffs seek to bring claims for unpaid meal breaks. *See Rother v. Lupenko*, No. Civ. 08-161-MO, 2011 WL 1311773, at *2 (D Or April 1, 2011); *Ross v. U.S. Bank Nat'l Ass'n*, 542 F

Supp2d 1014, 1024-25 (ND Cal 2008).  Consequently, even though OAR 839-020-0050 was not amended to explicitly provide a private right of action for unpaid meal breaks until July 1, 2010, it does not bar plaintiffs' unpaid break claims.[16]

### (2).    Individualized Issues

Jack in the Box argues that OAR 839-020-0050, in setting forth the minimum standards for meal periods, focuses on whether an "employee is relieved of all duties" which necessarily involves individualized inquiries into the circumstances of each break less than 30 minutes. These arguments are similar to those made to preclude conditional certification of the FLSA collectives.  The "similarly situated" requirement at the second stage of FLSA certification is "less stringent" than the requirement that common questions predominate in certifying class actions under FRCP 23.  *See e.g., O'Brien v. Ed Connelly Enters.*, 575 F3d 567, 584 (6th Cir 2009).

As discussed above, an individualized inquiry is central to resolution of the FLSA claims to determine if employees were actually relieved of all duties.  The same is true for the Oregon claims for unpaid breaks.  *See Chavez v. Lumber Liquidators Inc.*, No. Civ. 09-4812-SC, 2012 WL 1004850, at *7-8 (ND Cal March 26, 2012) (declining to certify a meal period class under similar factual allegations).  While common questions are raised by the break claims, the individualized inquiries necessary for resolution of these claims for each individual plaintiff are not capable of efficient classwide resolution.  *See Wal-Mart*, 131 S Ct at 2551.  Consequently, plaintiffs have failed to establish that there exists sufficient commonality and typicality to support certification of the break classes.

---

[16]  Because the court concludes that plaintiffs had a cause of action prior to July 1, 2010, the fact that none of the named plaintiffs were employed by Jack in the Box after this date is not significant, and the court need not address this argument any further.

67 - FINDINGS AND RECOMMENDATION

Because the court concludes that break class should not be certified, it examines the remaining Rule 23 requirements only with regard to the WBF and shoe classes.

## 2. **Adequacy of the Representation**

Adequacy of representation under Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." The satisfaction of constitutional due process concerns requires that absent class members be afforded adequate representation prior to an entry of judgment, which binds them. *Hanlon*, 150 F3d at 1020. The adequacy of representation inquiry raises two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id* (citation omitted). Representation is deemed adequate as long as one of the plaintiffs is an adequate class representative. *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F3d 1152, 1162 n2 (9th Cir), *cert denied*, 534 US 973 (2001).

Plaintiffs contend that their interests are the same as the putative class members because all worked at Jack in the Box, were subject to WBF deductions and ordered the required slip-resistant shoes by a payroll deduction. Plaintiffs also contend that they have retained competent counsel experienced in prosecuting class actions. Jack in the Box challenges the evidence of adequacy on the grounds that plaintiffs' interests are antagonistic when it comes to the shoe claims and that counsel cannot adequately represent plaintiffs' interests in a case of this magnitude.

First, with regard to adequacy of the named plaintiffs, Jack in the Box contends that plaintiffs seek to represent a class that includes individuals who are responsible for enforcing the rules and practices that they claim are unlawful. Specifically, some plaintiffs gave written

authorizations for payroll deductions, while others never signed such an authorization. Moreover, those plaintiffs in supervisory roles were expected to obtain those written authorizations which places them in an antagonistic position towards those class members who were never asked to provide a written authorization.  In support, Jack in the Box relies on *Hernandez v. Chipotle Mexican Grill, Inc.*, 118 Cal Rptr 3d 110, 122 (Cal App 2010), which denied class certification in part because some of the employees moved in and out of managerial responsibilities even though all employees shared the same job title.  The court concluded that under such circumstances, "some putative class members may accuse other putative class members of violating their meal and rest period rights" and, thus, there existed "antagonism of so substantial a degree as to defeat the purpose of class certification."  *Id.*

Plaintiffs point out that on appeal, the California Supreme Court remanded and directed the lower court to review its order in light of developing California law which differs from Oregon law in significant respects.  *Hernandez v. Chipotle Mexican Grill, Inc.*, 146 Cal Rptr 3d 424, 427 (Cal App 2012).  The earlier denial of class certification was upheld, in part because individual issues still predominated.  In order to determine whether California's break laws were violated, the court would have to consider the violations on a "restaurant-by-restaurant" and "supervisor-by-supervisor" basis.  *Id* at 436-37; *see also Bradley v. Networkers Int'l, LLC*, 211 Cal Rptr 3d 268, 288 (Cal App 2012) (discussing *Hernandez*).  While this argument is somewhat persuasive, this case presents a significant factual difference, namely that the Jack in the Box employees have different job titles depending on their responsibilities.  Only team leaders and management employees are tasked with ensuring that other employees fill out forms authorizing payroll deduction forms when ordering shoes.  Thus, in contrast to *Hernandez*, any individualized issues can easily be identified by way of job title and, if necessary, divided into

subclasses.  *See Willis*, 2008 WL 2167175, at *3 (noting that when it comes to differences

"between the working conditions" of various employees, this does not affect the class

certification question because, "[i]f, as the case proceeds, it becomes apparent that the positions

are so different as to affect the applicable legal analysis, [the court] will create subclasses.").

Consequently, no conflict exists among the named plaintiffs that would render them inadequate

to protect the interests of the class as a whole.

Second, with regard to whether plaintiffs have competent counsel, Jack in the Box argues

that Mr. Egan does not have the experience necessary to  handle this class action.  He has not

been lead counsel on any federal cases that have been certified and has not handled any case that

included claims or class members outside of Oregon.  Jack in the Box also argues that Mr.

Egan's declaration does not establish that he has the staff or resources to handle a large national

class action.  However, plaintiffs do not seek to certify their Oregon claims outside of Oregon.

Moreover, Jack in the Box has presented no evidence that Mr. Egan will not vigorously

prosecute this action on behalf of plaintiffs and the proposed class or that he is otherwise

inadequate counsel.  *See Hanlon*, 150 F3d at 1020.  Consequently, plaintiffs have satisfied the

adequacy of representation requirement.

### D.    Rule 23(b)(3) Requirements

"A Rule 23(b)(3) class is appropriate when a class action is superior to other available

methods for adjudication of the controversy and common questions predominate over the

individual ones." *Molski v. Gleich*, 318 F3d 937, 947 n10 (9th Cir 2003) (quotation and citation

omitted).  Plaintiffs need not establish the lack of individual issues, only that the class issues

predominate and that a class action is superior.  *See Las Vegas Sands*, 244 F3d at 1163; *Kamar v.*

*Radio Shack Corp.*, 254 FRD 387, 399 (CD Cal 2008).

70 - FINDINGS AND RECOMMENDATION

1.    **Predominance**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 US 591, 623 (1997).

> Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.

*Hanlon*, 150 F3d at 1022 (internal quotation omitted).

Jack in the Box again emphasizes that plaintiffs' claims require resolution of individualized questions and, thus, do not satisfy the predominance inquiry.  These arguments are largely the same as those made and rejected above in connection with commonality and typicality.  Moreover, at least one court in this district has observed that where the plaintiffs have presented evidence of companywide policies regarding uniform deductions, the questions raised by individual differences in job title, location, and supervisor, "go primarily to the issue of damages," which can easily be bifurcated into a separate damage phase.  *Willis*, 2008 WL 2167175, at *5.  Consequently, plaintiffs satisfy the predominance requirement.

2.    **Superiority**

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case . . .This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F3d at 1023 (citation omitted).  Generally, class actions have been found superior to a large volume of individual claims which would place a great strain on judicial resources if separately adjudicated.  *See id*; *Las Vegas Sands*, 244 F3d at 1163.

First, Jack in the Box contends that plaintiffs cannot satisfy the superiority requirement because combined notice would be confusing, reiterating many of the same arguments made in connection with whether dual certification is appropriate.  As discussed above, this court is not persuaded that potential difficulty in fashioning an effective notice is enough to deny certification.  It is premature to address any deficiencies in the details of sending out effective notices.  Instead, the central issue is whether a class action is the appropriate procedural mechanism for resolution of this dispute.

Jack in the Box also recycles its argument regarding the individualized proof requirements, which as noted above, does not render the WBF and shoe claims inappropriate for classwide treatment.

Finally, Jack in the Box notes that it has had no employees in Oregon since September 2011.  Thus, it asserts that the "primary advantage" of a Rule 23 class action is mooted because none of the class members have to fear any retaliation.  Plaintiffs respond that there are still over 50 Jack in the Box restaurants in Oregon.  Even though some are now owned by franchisees, many employees who worked for Jack in the Box at the time of the transfer to the franchisees are still employed and subject to the same unlawful policies.  However, as discussed above, this court has declined to included employees of franchisees as putative plaintiffs in this action.

In a case which is likely to encompass thousands of employees asserting wage and hour claims against Jack in the Box and where common questions predominate, a class action is the "least expensive alternative, and will avoid obtaining inconsistent results in multiple cases." *Willis*, 2008 WL 2167175, at *5.  "Class actions are the typical way of resolving allegations of wage and hour violations."  *Id.*  Consequently, plaintiffs satisfy the superiority requirement.

## RECOMMENDATION

For the reasons discussed above, plaintiffs' Motion for Class Certification (docket #109) should be GRANTED IN PART AND DENIED IN PART as follows:

Plaintiffs' proposed FLSA Workers' Benefit Fund and Shoe Collectives and Subcollectives should be conditionally certified under § 216(b) and proposed Rule 23(b)(3) Oregon Workers' Benefit Fund and Shoe Classes and Subclasses should be certified. Jon M. Egan and his law firm should be appointed as class counsel, and the named plaintiffs should be appointed as class representatives.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Thursday, February 14, 2013. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED January 28, 2013.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

73 - FINDINGS AND RECOMMENDATION